**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUN 1 7 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| LYNNE A. CARNEGIE On Behalf of Herself and All Others Similarly Situated, | |
| Plaintiff | No. 98 C 2178 |
| -against- | **DOCKETED** |
| | Honorable Elaine Bucklo JUN 1 8 2003 |
| HOUSEHOLD INTERNATIONAL, INC., HOUSEHOLD BANK, f.s.b., successor in interest to BENEFICIAL NATIONAL BANK, HOUSEHOLD TAX MASTERS INC., formerly known as BENEFICIAL TAX MASTERS, INC., BENEFICIAL FRANCHISE COMPANY, INC., H&R BLOCK, INC., H&R BLOCK SERVICES, INC., H&R BLOCK TAX SERVICES, INC., H&R BLOCK EASTERN TAX SERVICES, INC., BLOCK FINANCIAL CORP. and HRB ROYALTY, INC. | **SECOND AMENDED CLASS ACTION COMPLAINT** **Jury Trial Requested** |
| Defendants. | |

814

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  THE PARTIES, THEIR RELATIONSHIPS AND
      THE RICO ENTERPRISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      A.    Plaintiff
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      C.    The Contractual Relationships Between Defendants . . . . . . . . . . . . . 12
      D.    The RICO Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.   THE RAL SCHEME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      A.    The RAL Product . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      B.    The RAL Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      C.    The Deceptive and Trust Inducing Ad and Direct Mail Campaigns . 22
      D.    The Targets of Defendants' Deceitful Practices . . . . . . . . . . . . . . 25
      E.    The Bait and Switch . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
      F.    The RAL Application and Consummation of the RAL Credit
            Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      G.    The Uniform Omissions . . . . . . . . . . . . . . . . . . . . . . . . . 34

V.    THE FIDUCIARY BREACHES . . . . . . . . . . . . . . . . . . . . . . . . . 38
      A.    Block's Agency Relationship with its Customers . . . . . . . . . . . . . 39
      B.    Block's Special Relationship With Its Customers . . . . . . . . . . . . . 41

VI.   THE TILA VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VII.  VIOLATIONS OF THE INTERNAL REVENUE
      CODE AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 49

VIII. THE PATTERN OF RACKETEERING ACTIVITY AND
      COLLECTION OF UNLAWFUL DEBT . . . . . . . . . . . . . . . . . . . . 50
      A.    Pattern of Racketeering Activity . . . . . . . . . . . . . . . . . . . . . 50
      B.    Collection of Unlawful RAL Debt . . . . . . . . . . . . . . . . . . . . 57

IX.   THE RAL ARBITRATION PROVISION . . . . . . . . . . . . . . . . . . . . 58

i

X. CLASS ALLEGATIONS .......................................... 59

XI. CAUSES OF ACTION .......................................... 65

COUNT I
    AGAINST THE BENEFICIAL/HOUSEHOLD DEFENDANTS
    AND THE BLOCK DEFENDANTS:
    VIOLATION OF TILA, 15 U.S.C. § 1605, *et seq.* ...................... 65

COUNT II
    AGAINST ALL DEFENDANTS:
    VIOLATION OF 18 U.S.C. §§ 1961, 1962(a)-(d), *et seq.* ............... 69

COUNT III
    AGAINST ALL DEFENDANTS:
    VIOLATION OF THE ICFA AND SIMILAR UDAP
    STATUTES OF OTHER STATES ................................. 70

COUNT IV

    AGAINST BLOCK:
    BREACH OF FIDUCIARY DUTY ................................. 72

COUNT V

    AGAINST BENEFICIAL:
    SUBORNATION OF BREACH OF BLOCK'S FIDUCIARY DUTIES .... 73

COUNT VI

    AGAINST ALL DEFENDANTS:
    DEFENDANTS VIOLATED THE RAL AGREEMENT, A UNILATERAL
    CONTRACT, BY MAKING UNAUTHORIZED PAYMENTS .......... 74

COUNT VII
    AGAINST ALL DEFENDANTS:
    DEFENDANTS VIOLATE THE RAL AGREEMENT, A UNILATERAL
    CONTRACT, BY USING CONFIDENTIAL TAXPAYER INFORMATION
    FOR UNAUTHORIZED PURPOSES ............................... 74

**COUNT VIII**

   **AGAINST ALL DEFENDANTS:**
   **UNJUST ENRICHMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

**XII.  TOLLING OF STATUTES OF LIMITATIONS** . . . . . . . . . . . . . . . . . . . . . 76

**PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff, by her attorneys, alleges upon personal knowledge as to herself and her own acts, and upon information and belief (based on the investigation of counsel) as to all other matters as follows:

### I.  INTRODUCTION

1.     This case involves a sophisticated predatory scheme by defendants Household International, Inc., Household Bank, f.s.b. (successor in interest to Beneficial National Bank), Household Tax Masters (formerly known as Beneficial Tax Masters, Inc.), Beneficial Franchise Corp. and H&R Block, Inc., H&R Block Services, Inc., H&R Block Tax Services, Inc., H&R Block Eastern Tax Services, and Block Financial Corp.[1] systematically to target, deceive and defraud millions of lower income, unsophisticated taxpayers, year after year, into incurring unnecessary fees and unconscionably high interest charges.  The scheme is essentially a bait and switch whereby tax refunds become tax loans with interest rates which routinely exceed 100% annually, and are sometimes 300% or higher.  The loans are known as Refund Anticipation Loans ("RALs").  The scheme is referred to herein as the RAL scheme.

2.     Pursuant to the RAL scheme, defendants fail to disclose that RALs are *not* tax refunds.  Actually, RALs are loans.  Defendants fail to disclose that a RAL does not  provide proceeds at a  materially faster rate than electronically filing a return

---

[1]     The Household/Beneficial defendants are referred to collectively herein as "Beneficial".  The H&R Block defendants are referred to collectively herein as "H&R Block" or "Block".

and awaiting receipt of the mailed refund check.[2] The main difference between electronic

filing and the RAL is in the amount of money made available to the taxpayers. By

unwittingly incurring interest, bank fees, and "the full complement of detriments and

obligation endemic to loan transactions," consumers receive less money from RALs than

from refunds. *JTH Tax, Inc. v. H&R Block Eastern Tax Services, Inc.*, 128 F. Supp. 2d

926, 933, 938 (E.D.Va. 2001), *aff'd in part and remanded in part*, 28 Fed. Appx. 207,

211 (4th Cir. 2002).

        3.      Defendants implement the RAL scheme pursuant to written

agreements and practices between themselves, through the deceptive acts and practices

set forth herein, and the repeated use of interstate wire and U.S. mail services, and

collection of unlawful debts.

        4.      Beneficial developed and patented the RAL product, and H&R

Block markets and arranges the RALs for their unsuspecting customers. The RAL

application, year after year, makes plain that the RAL program is a joint effort. Until

1999, "A Refund Anticipation Loan Program offered by Beneficial National Bank (BNB)

in Association with H&R Block." Thereafter, "A Refund Anticipation Loan Program

offered by Household Bank, f.s.b., (HB) in Association with H&R Block."

> "The RAL application form on its face identifies it as part of a
> RAL program with an official 'in association with H&R' and

---

      [2]      Electronic refunds arrive within fourteen (14) days.   RAL proceeds are
available within five (5) days.

> contains repeated other references to H&R Block
> involvement. Moreover, it is Block who presents the form to
> putative class members for signature and by its terms is a
> beneficiary of and party entitled to enforce the arbitration
> clause included in the form. Under these circumstances, the
> content of the RAL application form and particularly the
> arbitration clause is attributable to Block as well as to
> Beneficial."

*Carnegie v. H&R Block, Inc.*, Index 606129/96 (N.Y. S. Ct. N.Y. Co. 1999) at 6.

Moreover, as of 1999 Block's legal department reviewed the proposed RAL application

and was obliged to do so by its agreements with Beneficial. *Id.* at 6, n.5.

5. Beneficial and Block have each collected, and continue to collect,

tens of millions of dollars from the excessive undisclosed fees associated with the RALs.

6. The RAL trade is profitable. RALs carry a pre-tax margin of 60%

for Block. *Forbes* (5/26/03 at p. 60.) A federal appeals court has affirmed a finding that

the conflation of "refunds" with RALs materially increases the returns processed by

Block. *JTH Tax, Inc.*, 28 Fed. App. at 211(returns increased by 24.8%).

7. The wrongs by defendants with respect to RALs are intentional,

ongoing, "malicious, hurtful and in bad faith." *Id.*. RAL misconduct has been the subject

of government censure, fine and sanction repeatedly and for more than twelve years.

8. Several states sued Block in the 1990s for engaging in deceptive

advertising by concealing the fact that RALs were loans. In July 1993, Block signed a

consent decree with the State of Connecticut under which it agreed not to use the term

"rapid refunds" to describe RALs. Block entered into similar agreements with the States

3

of Florida in January 1994 and New York in each year 1990 - 1993, 1995 and 1996. *See* ¶ 172, *et seq., infra.* In 2002, the New York City Department of Consumer Affairs again sued H&R Block for misleading and deceptive trade practices respecting RALs, and violating earlier agreement to cease such practices. *See* ¶ 173. Block settled.

9.    Defendants violate federal racketeering statutes through their pattern of racketeering activity, intentional ongoing fraud, and collection of unlawful debt. Defendants breach contractual duties to their customers, violate state consumer protection laws and violate I.R.S. Regulations, including I.R.S. Publication 1345 which requires RAL advertising to make "clear that the taxpayer is borrowing against the anticipated refund and not obtaining the refund itself". *See* IRS Pub 1345, 12.09, Rev. Proc. 98-50, 1998 WL 638827. Defendants knowingly and continuously use confidential taxpayer information for unauthorized purposes and in this regard violate 26 USC §7216, an imprisonable crime. Also, throughout the class period, defendants failed to make disclosures on loan documents as required by the Truth in Lending Act ("TILA"), 15 U.S.C. 1601, *et seq.*, and breached their fiduciary obligations to their customers by failing to disclose Block's secret financial interests in RAL and that it simultaneously served as agent for both the taxpayer and the RAL lending bank.

10.    In all ways material, defendants have acted or refuse to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class (23(b)(2), FRCP).

4

Defendants' repeated entry into and violation of consent decrees with governmental bodies and courts respecting the misconduct at issue here makes plain the need for an enforceable judgment in this regard.

11. In all ways material, the questions of law or fact common to the members of the class predominate over questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy. (23(b)(3) FRCP).

## II. JURISDICTION

12. This court has subject matter jurisdiction pursuant to 15 U.S.C. §§1601, 1640(e), 18 U.S.C. §1961, 1965, and 28 U.S.C. §1331. The court has subject matter jurisdiction over plaintiff's state and common law claims pursuant to the principles of supplemental jurisdiction set forth at 28 U.S.C. §1367, and choice of law analyses required by *In the Matter of Bridgestone/Firestone*, 288 F.3d 1012, 1015 (7th Cir. 2002).

13. This court has personal jurisdiction over defendants. Each systematically and continuously resides, has an agent, or transacts business in this state.

14. Venue is proper in this district under 15 U.S.C. §1640, 18 U.S.C. §1965(a), and 28 U.S.C. §1391, because the Beneficial defendants, who patented the RAL program, were at all relevant times conducting business here, the Household defendants were headquartered here, and Block acts as co-conspirator and aider and

5

bettor with Beneficial to effectuate the RAL scheme complained of, and many of the acts complained of occur and continue to occur in this state.

## III. THE PARTIES, THEIR RELATIONSHIPS AND
## THE RICO ENTERPRISE

### A. Plaintiff

15. Plaintiff Lynne A. Carnegie is a natural person and a consumer within the meaning of 15 U.S.C. §§1602(d) and (h) respectively. At all times material hereto, Ms. Carnegie has been a citizen of the State of New York. In 1995, Ms. Carnegie responded to H&R Block's advertisements by patronizing an H&R Block office in New York. Ms. Carnegie obtained a RAL from Beneficial. When engaging in said transactions, Ms. Carnegie relied on and was deceived by the wrongs complained of, including but not limited to the failure to make required TILA disclosures, to disclose H&R Block's ownership interest in the RALs, and that H&R Block received a kickback from the finance charge imposed.

16. Ms. Carnegie consummated a credit transaction for TILA purposes at the moment the RAL application was signed. TILA required disclosures were not however made to Ms. Carnegie until they appeared on the RAL check. Such was defendants' practice until 2000, when for the first time, they began providing TILA disclosures at the time the RAL is executed.

17. As a consequence of the RAL transaction, Ms. Carnegie was exposed to and suffered the imposition of interest and fees customarily levied by

6

Beneficial and Block in connection with such transactions, and in turn received proceeds less than what she would have enjoyed from a refund. She unknowingly subjected herself to the complement of detriments and obligations endemic to any loan.

**B.    Defendants**

18.    Beneficial National Bank was formerly a federally chartered bank with its principal place of business at 1 Rodney Square, Wilmington, Delaware. By itself and through its former subsidiaries, Beneficial Tax Masters, Inc. and Beneficial Franchise Corp., Beneficial National Bank developed and patented the RAL process. Thereafter Beneficial operated, and funded the refund anticipation loan ("RAL") program from 1987 through 1998 when its operations were acquired by defendant Household International, Inc. Beneficial marketed the RAL program to electronic income tax return originators (businesses that electronically file income tax returns) such as Jackson Hewitt, H&R Block, and various banks and independent tax preparation services throughout the country ("EROs"). At issue in this complaint are Beneficial' RAL activities with respect to H&R Block.

19.    At all times relevant hereto, Beneficial National Bank, acting together with the other Beneficial and Household defendants, regularly extended or offered to extend credit (within the meaning of 15 U.S.C. § 1602(c)) for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transactions which are the subject of this

7

action were initially payable, making Beneficial National Bank a creditor within the meaning of 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

20.     According to its public filings, including its December 2002 10-K, Household International, Inc. is principally a non-operating holding company incorporated in Delaware and with its principal place of business at 2700 Sanders Road, Prospect Heights, Illinois, 60070. Through its subsidiaries, which include the operations of Beneficial Corporation which Household acquired in 1998, Household Bank, f.s.b. and Household Finance Corp., Household offers RALs. Household International Inc.'s December 2002 10-K states:

> Our refund lending business is one of the largest providers of consumer tax refund lending in the United States. We currently have approximately 5,300 tax preparer relationships covering approximately 14,000 outlets (including 9,900 H&R Block and 546 Jackson Hewitt locations.) We provide loans to customers who are entitled to tax refunds and who electronically file their income tax returns with the Internal Revenue Service. This business is seasonal with most revenues generated in the first three months of each calendar year. The majority of customers who utilize this product are renters with average household incomes of $20,000 who are entitled to refunds of greater than $2,000. In 2002 we originated approximately 7 million accounts and generate a loan volume of approximately $10.7 billion.

21.     Applying the percentages in Household's 10-K, 71% of its $10.7 billion in 2002 RAL loan business, or $7.6 billion, was generated through the funding of H&R Block RALs.

22.     Defendant Household Bank, f.s.b. is a federal savings bank and a successor in interest to Beneficial National Bank. From July 19, 1998 until January 6, 2003, Household Bank f.s.b. was the originating bank for RALs.

23.     In November 2002, Household International Inc. and HSBC Holdings plc announced that they had entered into a definitive merger agreement under which Household would be merged into a wholly owned subsidiary of HSBC.

24.     Effective January 6, 2003, Household Bank f.s.b. ceased its operations in connection with the RAL program and, in connection therewith, Household Tax Masters engaged Imperial Capital Bank ("ICB") to perform the origination function for RALs.

25.     Defendant Household Finance Corp. is a Delaware corporation with principal executive offices at 2700 Sanders Road, Prospect Heights, Illinois 60070 that, according to Household International Inc.'s. December 2002 10-K, offers "refund anticipation loans. These loans are marketed to consumers at H&R Block offices, Jackson Hewitt offices and offices of other tax preparation services throughout the United States."

26.     According to H&R Block's January 31, 2003 10Q, defendant Household Tax Masters is successor in interest to Beneficial Tax Masters. and a Delaware corporation with its principal place of business at 200 Somerset Corporate

9

Blvd., Bridgewater, New Jersey 08807. Household Tax Masters is "the servicer of refund anticipation loans (RALs)."

27.     Defendant Beneficial Franchise Company, Inc. is a Delaware corporation and owner of the patented RAL process, formally known as the "Electronic Income Tax Refund Early Payment System."

28.     Defendant H&R Block, Inc. is a publicly traded corporation, with its headquarters at 4410 Main Street, Kansas City, Missouri 64111. H&R Block is in the business of individual tax preparation, tax return filing and tax advice, among other things. It is a direct participant in and otherwise responsible for the misconduct complained of herein. It wholly owns, operates or franchises, directly or through subsidiaries H&R Block Services, Inc. and H&R Block Tax Services, Inc., hundreds of permanent or seasonal offices throughout the country which hold themselves out and do business as "H&R Block" and engage in the preparation and filing of federal, state and local tax returns and tax advice. The Assurance of Voluntary Compliance or Discontinuance H&R Block entered into with Attorneys General in 41 states concerning H&R Block's "Peace of Mind" Guarantee specifically acknowledges that "H&R Block is in the business of individual and business *tax return preparation and advice . . .*" (emphasis added).

29.     In its January 31, 2003, 10-Q, H&R Block described its involvement with RALs as follows:

[T]he Company offers RAL products to its clients through a relationship with Household. In previous years, the Company purchased participation interests in RALs. . . Revenue from participation was calculated as the Company's percentage participation multiplied by a fee paid by the customer to Household.

30.     Defendant H&R Block Services, Inc. is a Missouri corporation with its principal of business at 4400 Main Street, Kansas City, Missouri.   Effective January 6, 2003 H&R Block Services, Inc. is the Block entity with primary responsibility for operating the RAL program.

31.     Insofar as RALs are concerned, defendant H&R Block Tax Services, Inc. generally does business as H&R Block.  Formerly a wholly owned subsidiary of H&R Block, H&R Block Tax Services, Inc. is now a wholly owned subsidiary of H&R Block Services, Inc.  Throughout the class period, H&R Block Tax Services worked with Beneficial and other RAL lenders to draft the RAL Application used nationwide in all H&R Block offices.  H&R Block Tax Services is headquartered at 4410 Main Street, Kansas City, Missouri.

32.     Defendant H&R Block Eastern Tax Services, Inc. generally also does business as "H&R Block."  H&R Block Eastern Tax Services, Inc. is a wholly owned subsidiary of H& Block Tax Services, and thus is an indirect wholly owned subsidiary of H& R Block, Inc.   H&R Block Eastern Tax Services, Inc. is headquartered at 4410 Main Street, Kansas City, Missouri.

11

33.     Defendant Block Financial Corp. is a wholly owned subsidiary of H&R Block, Inc. organized under the laws of Delaware with its principal place of business at 4410 Main Street., Kansas City, Missouri.  Block Financial Corp.  was created to purchase 49.999999% of what are known as "pool RALs".  "Pool RALs" are RALs made through any Block office owned by H&R Block, Inc., H&R Block Services, Inc., a corporate franchise or their affiliates.  Since 1997 alone,  Block Financial Corp. has earned pool RAL revenues in excess of $ 551 million.

34.     Defendant HRB Royalty, Inc. is a Delaware corporation with its principal place of business at 4400 Main Street, Kansas City, Missouri and the owner of the H&R Block trademark and logo that appears on all of the documents and deceptive and misleading advertising employed by defendants in effectuating the RAL scheme.

35.     At all relevant times, defendants aided, abetted and conspired with each other to implement the wrongs complained of herein.

**C.     The Contractual Relationships Between Defendants**

36.     At all times relevant hereto the RAL scheme has been memorialized in written agreements between H&R Block and its RAL lending partners.  Over the years, these RAL lending partners have varied, though defendant Beneficial has always held the patent on the RAL process.  By 1996, Beneficial National Bank was the exclusive provider of RALs through H&R Block.  In 1998, Household International purchased

12

Beneficial's operations and it, or a subsidiary, has been H&R Block's RAL lending partner ever since.

37.     Regardless of the year or RAL lender, the written RAL agreements are substantially uniform in all important respects. Each provides that H&R Block shall receive a kickback for every RAL it arranges. Since 1994, each has provided that H&R Block will have an ownership interest in 49.999999% in certain "pool RALs." Each enumerates how the RAL scheme shall be operated and controlled. Each establishes that the RAL scheme shall be effectuated through the use of interstate wires and the U.S. Mails. Each provides for the unlawful collection of usurious RAL debt. Each calls for the unauthorized use of confidential taxpayer information to market RALs in violation of 26 USC §7216. Each creates an association-in-fact enterprise to operate the RAL scheme described herein. The details of these RAL Agreements are set forth *infra* at IV B.

38.     The RAL Agreements also make plain that the RAL program is a joint effort by defendants. In court proceedings, Block has admitted that it serves as Beneficial's agent for arranging the RAL, screening applicants, transmitting the taxpayer data to the bank though the use of interstate wires, receiving from the bank, again through the use of interstate wires, the details regarding the loan proceeds and fees, printing the RAL check and delivering it to the customer either in person at the Block office, or

13

through the U.S. mails. *See, e.g., Green v. H&R Block, Inc.*, 355 Md. 488, 515, 735 A.2d 1039, 1054-55 (1999).

**D.    The RICO Enterprise**

39.    The RICO Enterprise here is an association-in-fact enterprise as defined at 18 U.S.C. §1961(4). It is distinct from its defendant participants. It includes Block Financial Corp. and has been made manifest by the RAL participation and operations agreements identified below. It also includes the other defendants who aid, abet, conspire, and cooperate with each other to execute and profit from the RAL scheme, and RICO Enterprise.

40.    At all relevant times, Beneficial and H&R Block have exercised control over the RAL Enterprise within the meaning of 18 U.S.C. §1962(c) and have conducted and participated in the conduct of the RAL enterprise, the collection of unlawful debt and pattern of racketeering activity as described in this complaint.

a.    Beneficial developed and patented the RAL process and H&R Block arranges for customers to utilize the process;

b.    Beneficial and H&R Block have controlled the deceptive and misleading advertising and marketing of RALs through direct mail and general advertising campaigns;

c.    Beneficial and H&R Block have controlled the inadequate disclosures with respect to RALs

14

        d.     Beneficial and H&R Block have controlled and established the undisclosed fees and finance charges with respect to RALs;

        e.     Defendants created Block Financial Corp. to pool RAL revenues and then divvy them among the RICO participants.

44.     In violation of 18 U.S.C. § 1962, defendants have at all times relevant hereto been involved in four types of prohibited activity, each of which affects interstate commerce. They have: (a) used or invested income received from a pattern of racketeering activity and collection of unlawful RAL debts to acquire an interest in, or establish or operate the RAL enterprise; (b) through a pattern of racketeering activity and collection of unlawful RAL debt, acquired or maintained an interest in or control of the RAL Enterprise; and (c) conducted or participated in the conduct of the RAL enterprise's affairs through a pattern of racketeering activity and collection of unlawful RAL debt. In addition, as the RAL agreements make plain, defendants have conspired to violate Sections 1962 (a), (b) and (c) above.

## IV. THE RAL SCHEME

**A.    The RAL Product**

45.     Beneficial Corporation, through its related and wholly-controlled entities, including Beneficial National Bank, Beneficial Tax Masters and Beneficial Franchise, developed a refund anticipation loan program through which it provides, *inter alia,* loan documents and funding for RALs. First utilized for the 1987 tax year,

15

Beneficial subsequently patented the "Electronic Income Tax Refund Early Payment System" to process RALs. Beneficial Franchise is the owner of the right, title and interest in the electronic system, which was patented under No. 4,890,228 in 1989 and under 5,193,057 in 1993.

46. In 1994, two of Beneficial Corporation's wholly-owned subsidiaries, Beneficial Data Processing Corporation and Beneficial Management Corporation, produced a "Guide to RAL & Refund Services," which was designed for electronic return originators ("EROs"), *i.e.*, tax preparers such as the Block defendants, who process RALs and tax-related services. In the guide, Beneficial summarized its role in developing the RAL industry:

> Together, Beneficial National Bank (BNB) and Beneficial
> Tax Masters developed and patented the RAL process.
> Having processed more RALs than any other RAL lender, our
> efforts have shaped the electronic filing and RAL industries
> during their inception as well as today -- and will continue to
> do so in the future. Beneficial's work in product innovation,
> quality services, and industry leadership are aimed at
> providing comprehensive tax-related financial services. To
> date, Beneficial has provided the first RAL, the first RAC, the
> first pre-filled application, the first Priority Card, the first
> Secured Card combined with a RAL/RAC.

The Guide's introduction concluded that "Beneficial National Bank and Beneficial Tax Masters, continues [*sic*] to explore new opportunities which help expand the industry -- because in the end, <u>what's good for your bottom line is good for our bottom line</u>" (emphasis added). There's no mention of what's good for the taxpayers' bottom line.

16

**B.     The RAL Agreements**

47.     Having patented the RAL process, beginning in tax year 1987, Beneficial contracted with H&R Block and other electronic return originators ("ERO's") to sell its product. Beneficial also licensed the RAL process to other banks, such as Mellon Bank, Greenwood Trust, and Bank One, who then also funded RALs for H&R Block.

48.     Each year since, Beneficial and Block's RAL dealings have been governed by written RAL agreements setting forth their respective roles in the RAL scheme. While the agreements have varied somewhat over the years, they are identical in all material respects. Each agreement establishes that:

(a)     Block solicits, through direct mail and general advertising, customers for RALs;

(b)     Block will present to such customers the standard RAL application form which Block and Beneficial together create;

(c)     Block will screen potential RAL applications, collect confidential taxpayer information and transmit that to Beneficial via interstate wires;

(d)     Block will obtain the customer's signature on the RAL application and IRS Form 8453, which assigns the taxpayer's refund to Beneficial, thereby consummating a credit transaction and creating a binding irrevocable agreement between the taxpayer, Block and Beneficial;

17

(c)     Block will receive a "license fee" or kickback (which has ranged from $3 in 1988 to $9 in 2000) from Beneficial for every RAL it arranges;

(f)     Block has the right to purchase a 49.999999% ownership interest in certain RAL profits[3];

(g)     Beneficial will transmit via interstate wires to Block the information needed for Block to print out the RAL check, *i.e.* the loan amount and amount of finance charges and all fees;

(h)     Block will print the RAL check at the Block office and using blank check stock provided by Beneficial and bearing the Beneficial logo and signature;

(I)     Block will deliver the RAL check to its customers either in person or through the U.S. Mails;

(j)     Block shall store the taxpayer's confidential data in an electronic file for a certain period of time, ranging from 3 ½ to 5 years.

49.     For example, the August 22, 1991 (the "August 1991 Agreement") between H&R Block and Beneficial provides for Beneficial to supply RALs to certain customers of H&R Block, and to designated major and satellite H&R Block franchises. H&R Block's rights, duties, and obligations include "to solicit any customers for present and future loans and financially related products including, without limitation, deposit

_____

[3]     Block's right to participate in these RAL profits was first established by written agreement dated December 6, 1994.

18

products" (Art 1.3). *Inter alia*, H&R Block is meant to prepare and/or file the federal returns, implement all qualifying procedures, handle RAL applications, and actually complete and deliver the lender checks, which have been entrusted to H&R Block (Art.1.1, 1.2, 1.3, 1.4, 1.6, 1.8).

50.     As part of its obligations, H&R Block agreed that a RAL customer's RAL applications "shall be stored in the applicant's client file maintained by H&R Block" (Art 1.6). H&R Block agreed not to dispose of such data for at least 40 months (*id.*).

51.     Defendants have used the data to market the RAL product through the use of the U.S. mails in subsequent tax seasons in violation of the RAL contract and 26 U.S.C. §7216.

52.     The August 1991 Agreement also provided for the kickback to Block for every RAL it refers (Art. 5.5.) Defendants internally refer to such payments as a "license fee." It is a kickback of interest paid by RAL clients (a prepaid finance charge within the meaning of TILA (12 C.F.R. §§ 226.2(a)(23) and 226.4(a)), and/or a direct payment from Beneficial for the procurement and arrangement of high interest loans. In a substantial number of instances, the kickback represents more than ½ of a percent of the loan. In either case, Beneficial's and Block's clients have been and are being deceived. No Block document discloses that Block is neither providing impartial tax services and advice, nor serving the taxpayer's interest. Taxpayers justifiably believe, as Block's ads state, that Block is "watching over them".

53.     The 1991 RAL agreement also provided that Block will have "the care and custody of consecutively numbered Beneficial disbursement checks upon which [the tax preparer] may affix a Beneficial facsimile signature by way of an imprint of the authorized Beneficial signatory. . . ."

54.     It further provided that Beneficial Tax Masters agreed to indemnify Beneficial National Bank and H&R Block, respectively, for:

> any violation of the Federal Truth in Lending Act or Regulation Z of the Federal Reserve Board and other applicable federal and state banking and consumer finance laws and regulation [sic], caused either by Tax Masters or Beneficial involving any of the preprinted terms and disclosures set forth on the check to RAL customers from Beneficial; relating to the procedures for applying for or obtaining RALs, or relating to the RAL applications or in any other manner to the RAL program . . .

55.     The August 1991 Agreement was amended on December 6, 1994 (the "1994 Agreement"), and provided for RAL fees for the 1995-1997 tax periods.

56.     Both the 1991 and 1994 agreements expected that in all material respects the RAL scheme would be implemented in a substantially uniform respect nationwide, and it has been.

57.     The 1994 agreement provided further that H&R Block could purchase an ownership interest in RALs made by Beneficial National Bank, *to wit*,

> "Beneficial shall permit H&R Block (or any subsidiary or affiliate of H&R Block) to purchase up to a 49.999999% beneficial ownership interest in the aggregate in RALs made

20

to RAL customers generated through [H&R Block offices]."
¶ 6.

58.    Effective July 19, 1996, H&R Block and Beneficial entered into a RAL participation agreement ("Participation Agreement"). At the same time, H&R Block Tax Services and Beneficial entities entered into a RAL operations agreement ("Operations Agreement"). These, together, again provided for H&R Block's purchase of a 49.99999% participation interest in what was defined as Pool RALs (Participation Agreement, Art. II).

59.    The Participation Agreement also provided that Beneficial would supply customer lists to H&R Block (Art. 7.1). The Participation Agreement provided for a term expiring on June 30, 2006.

60.    The Operations Agreement obliged H&R Block to store RAL customers applications, and retain that data for 60 months (Art. 1.6). The Operations Agreement provided for a term expiring on June 30, 2006 (Art. 6.1), and also provided for license fees to H&R Block (Art. V.) The Operations Agreement restated Block and Beneficial's prior RAL agreements in all other material respects, *i.e.* regarding transmission of data, printing of RAL checks at the Block locations, etc.

61.    Block had comparable fee and loan participation arrangements with other lenders. For example, in 1993-1994, H&R Block purchased and owned a 49.999999% interest in all RALs extended by Mellon Bank.

21

62.     Effective January 6, 2003, H&R Block Services, Inc. entered into a RAL operations agreement with Household Tax Masters, Inc., and Beneficial Franchise Company, Inc. ("2003 Operations Agreement"), the terms of which are consistent in all material respects with those contained in prior RAL Operations Agreements.

63.     Effective January 6, 2003, Block Financial Corporation , Household Tax Masters, Inc. and Household Bank, f.s.b., for limited purposes, entered into a RAL participation agreement, the terms of which are consistent in all material respects with those contained in prior RAL Participation Agreements

64.     For the entire class period, H&R Block's interest in the pooling arrangement and receipt of the RAL/kickback was never disclosed in any of the materials provided to the taxpayer.  H&R Block's counsel admitted this in 1997: "Counsel for defendant asserts that to their knowledge defendants are not aware of any disclosures of license fees and pooling agreements with Beneficial to RAL customers." *See Carnegie v. H&R Block, Inc.*, Index No. 6016129/96 (N.Y. Sup.) Order of Justice Lewis R. Friedman, dated July 22, 1997.

## C.     The Deceptive and Trust Inducing Ad and Direct Mail Campaigns

65.     Since 1987, defendants have lured clients to RALs through extensive advertising promoting "Rapid Refunds".  A true "Rapid Refund" enables taxpayers to obtain tax refunds by filing electronically.  No loan or interest payment is involved. Prospective clients seeing this seemingly attractive service are induced to call or visit

22

H&R Block offices. H&R Block then steers the taxpayer from the Rapid Refund toward the more profitable RAL.

66. Defendants also use the U.S. Mails to send thousands of misleading and deceptive advertisements to prior and/or prospective customers in which RALs are misleadingly promoted under the "Rapid Refund" logo. RALs are not advertised as RALs in isolation. Typically, reference to RALs is as part of a Rapid Refund ad. This is one of the ways in which defendants omit to distinguish between the products, and introduce and sustain confusion.

67. A principal focus of the direct mail and public advertising campaigns is to create the impression that H&R Block is trustworthy, and watching out for its clients. H&R Block markets itself as "someone to watch over" its client, and as "America's Tax Team - Standing Up For You." H&R Block's campaign calls upon the consumer to "Do what millions of Americans do. Trust H&R Block." H&R Block assures the consumer that, "AMERICA'S TAX TEAM WILL TAKE THE WORRY OUT OF YOUR TAXES THIS YEAR. WE GUARANTEE YOUR SATISFACTION". One of H&R Block's advertising fliers states "At H&R Block, our tax training program has one aim . . . to earn your continued confidence." Numerous mailings contain the following language:

> "Of course, in addition to getting their refunds **FAST**, H&R Block clients enjoy the peace of mind that comes with knowing their income tax returns have been prepared and checked by our experienced staff."

23

68.     In the Block promotional material provided plaintiff, Block wrote "Thank you for placing your trust in H&R Block." H&R Block's advertisements are intended to and do instill the belief that consumers should place their trust and confidence on tax matters in H&R Block. H&R Block mailings to RAL prospects state, "You can trust H&R Block. It's why America returns".

69.     Advertisements also are designed to create the impression that Block can deliver a tax refund to its clients more rapidly than otherwise available, at little or no additional cost. The truth is that Block cannot deliver an electronic refund more quickly than anyone else.

70.     H&R Block widely advertises a "rapid [tax] refund" for its customers nationwide. H&R Block advertisements tout, "WHY WAIT? IT'S YOUR MONEY!" or, "Why wait for your tax refund when you can get your money *FAST!*" Signs that have been placed in storefronts and on public transportation trumpet: "RAPID REFUND. REFUND IN 2 DAYS", "GET YOUR REFUND FAST!", "Why wait for your federal income tax refund?". These advertisements all contain HRB's registered trademark, "H&R Block." Each advertisement is designed to deceive people into believing they would received their tax refund, not a loan, with little or no out of pocket costs.

71.     Of these practices, various courts and administrative agencies have written:

24

> Block's advertisement of RAL-type products as "refunds,"
> "refund amounts," and checks "in the amount of your refund"
> on the "heels of its repeated representations by way of the
> consent decrees that it would no longer misrepresent loan
> products as refunds amply supports the district court's
> conclusion that Block conducted [that] advertising campaign
> in bad faith.

*JTH Tax*, 28 Fed. Appx. at 213.

*     *     *

> In view of Block's history of affirmatively representing in
> multiple state consent decrees that it would refrain from
> advertising RAL products in a misleading manner; the public
> nature of the provisions set forth in Publication 1345,
> requiring Block to do the same; . . . we have little trouble
> concluding that the district court's conclusion that <u>Block acted
> maliciously, willfully, deliberately, and in bad faith in
> conducting that advertising campaign was more than
> reasonable</u>.

Id., at 214 (emphasis added).

72.     In all material respects, including the entitlement to trust H&R

Block, failure to disclose that RALs are not refunds, the omissions of the costs associated

with RALs and H&R Block's multiple economic benefits from the RAL scheme, RAL

public and direct mail advertising has been substantially uniform nationwide.

**D.     The Targets of Defendants' Deceitful Practices**

73.     As part of the RAL scheme, Block and Beneficial intentionally

target, uneducated (high school or less), people who are of low income. H&R Block

founder Henry Bloch testified in response to the question, "[d]o you know who your

25

customers are?", "[t]hey are not the wealthy, the upper income people. I often hear, 'My maid goes to you'."

74. Block's internal marketing studies show that the majority of Block customers are unable to distinguish between a Refund Anticipation Loan and electronic filing of a tax return that would result in a Rapid Refund of one's tax over-payments. In reversing summary judgment in favor of Block, a Pennsylvania Appellate Court found that Block "exploited a corresponding opportunity to abuse [their] trust for personal gain." *Basile v. H&R Block, Inc.*, 777 A.2d 95, 106 (Sup. Ct. 2001).

75. Taxpayer confusion between Rapid Refunds and RALs is essential to the success of the RAL Scheme, Block counts on this, and has known of the confusion since at least 1990 when it was first sanctioned by the New York City Department of Consumer Affairs for misleading and deceptive advertising that confused RALs with Rapid Refunds. Block has been sanctioned by state or local governments no fewer than eight times, most recently in December 2002 for deceptive RAL practices. *See JTH Tax*, 28 Fed. Appx. at 209, and discussion of pattern of racketeering activity at ¶ 165 *et seq., supra.*

76. RAL customers generally are unrepresented by counsel in their dealings with Block and the RAL lender. Nor do they have access to independent accounting advice. These customers are in a subservient position to and rely upon Block

26

to be candid, fair and honest. According to Block's own advertisements, they "do what millions of Americans do. Trust H&R Block."

77.     Direct mail and general marketing materials issued by Block that mention Beneficial are reviewed, and passed upon, by Beneficial pursuant to the written RAL agreements. In cases where any Beneficial entity's name or trade name is used in such materials Beneficial reviews the marketing materials in question.

## E.     The Bait and Switch

78.     Having "baited" customers into contacting Block for a Rapid Refund, Block "switches" the offered product to the more profitable RAL with multiple charges, including extremely high rates of interest, and undisclosed fees and other profits to Block and to Beneficial.

79.     Customers calling Block to inquire about Rapid Refunds are directed first to the possibility of obtaining a two-day refund.

80.     The solicitation is fully scripted in all material ways and uniformly omits to disclose in any meaningful fashion, if at all, that the shorter period entails a loan, nor does it not explain the additional charges, nor Block's special financial interest in the loans.

81.     Block's training material throughout all times relevant hereto uniformly instruct Block employees at company owned offices and franchises to push RALs. Employees are instructed in Block's Rapid Refund Procedure manuals that,

27

regardless of the reason for the customer's visit, "if return meets RAL requirements, offer RAL first" (*i.e.*, before other Block products).

82.    Block and Beneficial lull the client into undertakings to commit himself or herself to the RAL charges by not demanding money up front. All charges, including interest, are deducted by Beneficial from the gross refund before the remainder is sent to the taxpayer. This assures concealment of the full fee amount and actual interest rate charged until the client receives the loan check, and prevents the client from proceeding with the transaction on an informed basis. The taxpayer is not represented by counsel.

83.    Block's repeated sanctions and violations of consent decrees (the most recent of which was entered into in 2002 with the City of New York) to discontinue the practice of failing to distinguish between its rapid refund products and RALs confirm that the bait and switch is intentional, ongoing and systematic. *See, for example, JTH Tax*, 28 Fed. Appx. at 212, 214 ( "we have little trouble that the district court's conclusions that Block acted maliciously, willfully, deliberately, and in bad faith in conducting that advertising campaign was more than reasonable").

**F.    The RAL Application and Consummation of the RAL Credit Transaction**

84.    Upon visiting the H&R Block office, the customer is presented with a RAL application. While the RAL application varied somewhat over the class period, it was substantially uniform in all material respects.

28

85. The RAL application is created jointly by defendants, used uniformly nationwide in all H&R Block offices, and, as set forth herein, has the effect of altering taxpayer's legal relations with Block, Beneficial or another lending institution, and of course the government of the United States.

86. The RAL Application also sets forth the credit criteria that govern which H&R Block customers are appropriate RAL candidates.

87. Upon signing the RAL application, the taxpayer (1) commits to paying a charge for having the RAL considered, even if it is denied or cancelled; (2) *irrevocably transfers* her entitlement to the tax refund to Beneficial; (3) and consents to having defendants open an account in her name, with accompanying close out costs or "account administration fees". This amount, undisclosed in early years, has ranged from $18 to $19.95 since 1997.

88. The RAL Application, in each year of the class period, contained a substantially uniform "Authorization" providing in relevant part:

> I hereby authorize and request Beneficial to establish an account in my name at Beneficial to receive annually my tax refund from the Internal Revenue Service ("IRS") and I authorize Beneficial to deduct funds from the proceeds of either my RAL or my account at Beneficial and pay my ERO any fees or charges for the preparation and/or filing of my tax return **which I have authorized**. [emphasis added]

89. The RAL Application, in each year, also contained substantively the following language, quoted from a 1995 form:

29

On the date I sign this application, I hereby authorize and request H&R Block and its affiliates to disclose to Beneficial National Bank and its agents ("BNB") my federal income tax return for tax year 1994, any and all other information contained in such tax return, all information supplied to H&R Block, including IRS direct deposit information, in connection with the preparation of such tax return, and all other information contained in this form and any information contained in any of my prior RAL applications which was disclosed to H&R Block. I authorize and consent to the disclosure of all the foregoing information for the purpose of enabling BNB to determine whether or not to make a Refund Anticipation Loan ("RAL") to me in response to my application for such loan which is a part of this form. . . . H&R Block may not use or disclose such tax return information or such other information for any purpose (not otherwise permitted under Treas. Reg. Sec. 301.7216-2) other than as stated herein, except that BNB or its affiliates may use such information to conduct system testing of the RAL program to update such system and keep it operational.

90.     The RAL application creates a unilateral contract. A unilateral

contract results from an exchange of a promise for an act. In a unilateral contract, there is

no bargaining process or exchange of promises by parties as in a bilateral contract. The

language and terms of the Loan Agreement are not negotiable. For example, Block

promised (or offered) in the above-quoted provision of the RAL application to transmit its

customers' tax (and other) information to Beneficial for the purpose of enabling

Beneficial to determine whether to extend a RAL, and further promised not to use the

customers' tax information for any other purpose. This promise (or offer) invited

performance by the customer: execution of the RAL application authorizing the release of

30

the customer's tax information to Beneficial. Such performance by the customer constituted both acceptance of Block's and Beneficial's offer and consideration.

91. Defendants breached the unilateral RAL contract when they used the customers' tax information for purposes other than what was authorized, and to generate undisclosed and unauthorized profits for themselves.

92. The client also signs an IRS Form 8453 (the Federal Income Tax Declaration for Electronic Filing), authorizing the IRS directly to deposit the refund into an account in the client's name at Beneficial. Block sends the signed loan agreement to Beneficial and electronically transmits the Form 8453 with the customer's tax return to the IRS via the use of interstate wires.

93. The RAL is consummated once the client signs and submits the Loan Agreement, *Affatato v. Beneficial Corp.*, 1998 WL 472494 (E.D.N.Y. August 7, 1998), because, *inter alia*:

(a) In each year, the RAL Agreement expressly has stated: "I acknowledge, understand and agree that, notwithstanding anything else to the contrary contained either herein or in any other document relating to this transaction, my signing this Loan Application, Authorization and Certification for a Refund Anticipation Loan and the IRS Transmittal Form 8453 constitutes an *irrevocable transfer* to Beneficial of all my rights, title, and interest in the proceeds of my tax refund . . . . "; (emphasis added) and,

31

(b)     H&R Block immediately transmits, via interstate wires, the tax return and IRS Form 8453, thereby initiating the process whereby the IRS sends the client's refund directly to Beneficial. There is no realistic manner in which the client can abort the process. To attempt to do so, the client would have to retain an accountant to transmit new payment instructions to the IRS. Assuming this could be done, the time and expense involved would exceed the financial benefits to the client. Moreover, the RAL application itself provides that the client will have to pay an "account administration fee" if the RAL is canceled or otherwise denied.    Undisclosed in early years, since 1997, this fee has ranged from $18.00 to $19.95.

94.     After Beneficial reviews the electronic information provided to it by Block regarding the RAL applicant, Beneficial determines whether, and in what amount, to issue the RAL.

95.     The RAL itself is made only after a screening process conducted by Block and Beneficial that will approve only the most risk free loans. Each applicant is screened for outstanding debt to the government (*e.g.* student loans in arrears, back taxes or unpaid child support). Even when the loan is denied, the taxpayer already has committed to use H&R Block as its tax preparer, the return will be filed, and the lender will still receive the denied customer's refund check. Further, the customer will have already committed to the account administration fees discussed above. Charges by both the lender bank and H&R Block will still be levied, and H&R Block will still have its

32

share of the profits for those fees earned on the denied loan. The irrevocable transfer of rights to the refund also means that the taxpayer will not be able to secure a refund from a Block competitor or directly from the government.

96. After approving the loan, Beneficial then transmits to Block, via interstate wires, the taxpayer's RAL details, *i.e.* amount of loan, fees, TILA disclosures.

97. Thereafter, and pursuant to the RAL agreement, H&R Block prints the RAL check on Beneficial blank check stock maintained at the Block office and on a linked printer dedicated to that task. H&R Block also prints the so-called TILA disclosure stub ("stub") attached to the loan check. Both bear Beneficial's logo. Block also is in possession of Beneficial's official signature, which it imprints on RAL checks to be issued.

98. This process is memorialized in the RAL agreements. For example, in the 1991 RAL agreement Beneficial agreed that Block will have "the care and custody of consecutively numbered Beneficial disbursement checks upon which [the tax preparer] may affix a Beneficial facsimile signature by way of an imprint of the authorized Beneficial signatory. . . ." Subsequent RAL agreements each have contained similar language.

99. H&R Block makes the check and stub available to taxpayers for collection, or sends it to them via the U.S. Mails.

100.     During the entire class period, the taxpayer first received TILA disclosures and learned the precise magnitude of the charges and interest rate associated with her RAL, when she received the actual RAL check.

## G.     The Uniform Omissions

101.     For each year of the class period, defendants made incomplete disclosures at the time of RAL consummation.    They disclosed only the flat finance charge for each RAL on the Loan Application.    The APR was not disclosed.    Nor was the tax preparer's kickback, or other fees, *i.e.*, loan documentation, disclosed as part of the amount financed or as a prepaid finance charge, or in any other manner.

102.     Even the tardy disclosures provided were deficient. While they purported to disclose the "amount paid to H&R Block," and the total prepaid finance charge, they did not disclose Block's receipt of the license fee, the amount of such fee or that such was a prepaid finance charge and part of the amount financed.    The disclosures omitted to reveal Block's ownership interest in the RALs.

103.     Since 2000, defendants have disclosed that the license fee paid to Block is part of the amount financed a pre-paid finance charge, and have disclosed this when the RAL is consummated, *i.e.* when the RAL application is signed.    The fact that defendants now provide the disclosures at the time of consummation confirms that such could have been and should have been provided at that time throughout the class period.

34

104.    Filing/preparation fees have always also been part of the amount financed, but were not itemized nor deducted from the amount financed, nor included in the disclosed finance charge or APR during the entire class period. Nor did defendants disclose a purported APR until it provided TILA Disclosures on the RAL check stubs.

105.    During the entire class period, no RAL application, or other material, disclosed that Block received a license fee from the RAL lender for procuring, soliciting, or otherwise driving or brokering every RAL and what that amount was.

106.    During the entire class period, no RAL application, or other material, disclosed that Block had an ownership interest in the profits or losses of the RAL business, which Block had effective December 6, 1994.

107.    During the entire class period, no RAL application, or other material, disclosed that the client would receive a RAL for only a portion of the refund, if the refund exceeded a certain amount.

108.    During the entire class period, no RAL application, or other material, accurately illustrated the annual percentage rate of the loan. Some had no illustration. Those that did have an illustration utilized a hypothetical 14-day loan period based on the representation that 14 days would be the approximate time before the refund is paid to the lender. In truth, the loan typically is outstanding for nine days. As a consequence, the illustrative APR was understated by more than 50%.

35

109. During the entire class period, no RAL application, or other material, disclosed the true nature of the Block Defendants' relationship with Beneficial as broker or agent for Beneficial, or that Block was simultaneously serving as Beneficial's agent with whom it had secret profitable dealings. The receipt of the fees from the lenders created a conflict of interest. The failure to disclose such conflict or conflicts constituted a breach of Block's fiduciary duties.

110. During the entire class period, no RAL application, or other material, adequately disclosed that a RAL was not the only or best means of receiving an expedited tax refund.

111. During the entire class period, no RAL application, or other material, informed or advised that RALs were financially disadvantageous when compared to other available source of borrowed funds with much lower finance charges.

112. During the entire class period, no RAL application, or other material, adequately informed that an expedited tax refund was available through electronic filing without a RAL and its attendant charges.

113. During the entire class period, defendants had the capacity to disclose the actual charges before the RAL was executed, but did not do so.

114. No H&R Block or Beneficial manual directed that tax preparers inform taxpayers in writing of all charges levied on the loan before the taxpayer executes the irrevocable RAL application.

36

115.   No RAL application, or other H&R Block material, ever has disclosed that H&R Block, alone or in conjunction with the lending institution, may use taxpayer confidential data to solicit business via the U.S. Mails in subsequent tax periods.

116.   The stub of Carnegie's loan check illustrates a number of the typical misrepresentations and omissions. *See* Exhibit A. The stub disclosures and omissions are typical in all material respects of what defendants supplied to class members during the entire class period.

117.   The stub shows that the plaintiff Carnegie's RAL was $500. This is less than the $2,291 refund to which she was entitled. The remainder of the refund was made available to plaintiff two weeks later, longer than when a rapid refund would have been received without the RAL feature. Plaintiff was not informed about this split check practice prior to being irrevocably committed to the transaction. Thus, with the additional charges levied on her refund, plaintiff received only 17% of her total refund ($390 [$500 less charges]/$2291) about nine days faster than if she had filed electronically without a RAL. For the privilege of receiving the small portion of her refund merely days earlier, plaintiff paid $110.

118.   The stub omits to inform that H&R Block received a fee for having procured, solicited, or delivered the loan to the lender.

119.   The stub omits to inform that H&R Block owned a part of the loan.

37

120.    The stub has a line item that states, "Amount Paid to H&R Block". This line item omits to disclose the license fee, which materially increases the amount paid to H&R Block. It also omitted to disclose that the license fee to H&R Block is a prepaid finance charge and part of the amount financed.

121.    The fact that defendants have, since 2000, provided the above fee information at the time of consummation confirms that during the entire class period there was no practical impediment to a disclosure of all of that which was omitted or misrepresented prior to the time when the client executed, irrevocably, the RAL application.

## V.    THE FIDUCIARY BREACHES

122.    A fundamental tenet of fiduciary/agency relations is that the fiduciary/agent cannot profit from its relationship without disclosure and the informed consent of the beneficiary/principal. It is also axiomatic that no agent can serve two masters without informed consent. Block has violated both principles and is liable to the class as a result.

123.    Another fundamental principle in fiduciary matters is that a person who intentionally causes or assists the fiduciary/agent to violate a duty to the beneficiary is liable to the beneficiary. *See, Restatement of Agency 2d*, §§312, *inter alia*.

124.    By inducing Block to introduce and operate the RAL scheme as it has, and by aiding, abetting, co-conspiring and profiting from that scheme as it has,

38

Beneficial has violated this principle and is liable to the class for Block's fiduciary failures.

125.    There are two bases for H&R Block's fiduciary relationship with its customers. One is that Block serves as its customers' agent for a variety of tax related services. Block has conceded this. *See Green* 735 A.2d at 1054-55. The other derives from Block's confidential and trust-induced relationship with its customers, its admitted and advertised special expertise and sophistication in tax preparation, tax services and IRS regulations, and its uniform advertising and direct mail campaigns that encourage its low income, unsophisticated consumers to trust and rely on it. *See, e.g., Basile v. H&R Block*, 777 A.2d 95, 104 (Sup. Ct. Pa. 2001).

A.    **Block's Agency Relationship with its Customers**

126.    As part of the income tax preparation services and counseling offered to the public at H&R Block offices, for which H&R Block charges tax preparation clients a fee, Block undertakes the duty to both prepare and/or explain, as the case may be, the various options, elections, forms and documents involved in an individual's tax preparation matters, including those involved with the taxpayer obtaining back any tax refund he or she was owed by the government, such as electronic filing and RAL forms.

127.    Maryland's highest court found that Block admitted that "it acts as an agent for its customers for the purposes of preparing the tax return and filing it with

39

the IRS," and that Block "concedes that it acts as its customers' agent in transmitting the RAL application." *Green*, 735 A.2d at 1049-1050. It found also that "the taxpayer retains ultimate decision making authority respecting Block's actions regarding her tax return, " and therefore, that customers retain enough control over H&R Block to support a finding of an agency relationship. *Id.* at 1051.

128. Throughout the class period, the RAL agreement that plaintiff and members of the class sign expressly authorize H&R Block to act as their agent by (1) preparing their tax returns; (2) checking the accuracy of the tax returns; (3) electronically filing their tax returns; and, (4) if necessary, accompanying them to an IRS audit. The folder in which plaintiff and class members' tax returns and other documentation are given to them states that:

> If your income tax return is audited, H & R H&R Block will appear with you at that audit and explain how your refund was prepared, even though we cannot act as your legal representative.

129. Also as agent, and pursuant to the RAL application, H&R Block arranges to open taxpayer bank accounts with lending institutions, and for the payment of taxpayer bills both to itself, such institutions, to the IRS, and to local taxing authorities.

130. Block's agency also derives from the fact that H&R Block's role in the RAL application process, an integral part in the customer's receipt of the loan, indisputably has legal ramifications for the customer and the RAL lender. *Id.* at 1053.

40

131.    Pursuant to the RAL application and agreement, Block prepares and transmits taxpayer RAL applications to the lending bank, obtains the bank's acceptance of the application, and then receives and delivers to the taxpayer the proceeds of the loan. The RAL application expressly authorizes Block to share the customer's tax return and related information on a limited basis, which Block itself prepared, admittedly as its customer's agent. The bank delivers the loan check to Block, which holds it and turns it over to its customer, unless Block itself manufactures the loan check pursuant to agreement with the lending bank. There is no question, therefore, that Block plays an integral part in the taxpayer's customer receipt of the bank loan, which then carries legal ramifications for both the Block customer and for Beneficial. Maryland's highest court has so ruled. *See, Green* 735 A.2d at 1053.

**B.    Block's Special Relationship With Its Customers**

132.    Block's special relationship of confidence and trust with its customers is a second basis for the fiduciary relationship. *Basile*, 777 A.2d at 103; *Green,* 735 A.2d at 1053 (Block intentionally has created circumstances under which its customers would trust it to obtain the maximum refund fast, and that customers reasonably believe Block is acting as their broker for the best tax services).

133.    Senior Block officials have acknowledged that it is and was Block's goal to establish trust with all of its millions of customers, to induce customers to trust and rely on Block's tax preparers and that a high number of customers trust Block.

41

134.    In addition, Block is in a dominant position regarding the taxpayer who is usually unsophisticated, of limited education, financially strapped and sometimes elderly. Block customers are generally without legal representation. Taxpayers are in a subservient position to H&R Block and rely on H&R Block to be candid, fair and not to profit in what is a decidedly unequal fiduciary relationship.

135.    Notwithstanding the foregoing, defendants have demonstrated little or no respect for the clients whose trust they solicit. Internal Beneficial documents reveal staff referring to RAL customers as "one step above pond scum".

136.    One of the many ways in which Block breaches its undertakings and duties to its client is by failing to properly and/or adequately explain the content and meaning of the terms and conditions of the RAL application and documentation.

137.    Another hallmark of Block's special relationship is that Block transacts business or handles money for the benefit of taxpayer clients as to whom H&R Block stands in a relationship implying great confidence and trust.

138.    H&R Block also holds itself out as giving advice for the benefit of the taxpayer. In the Assurance of Voluntary Compliance or Discontinuance entered into by H&R Block and the Attorneys General of 41 States, Block says it is in the business of individual "tax return preparation and *tax advice*." (emphasis added)

42

139.    Finally, unlike plaintiff and all class members, defendants are large corporate entities. H&R Block has spent a substantial sum of money, *inter alia*, on attorneys' fees in developing the RAL application forms.

140.    RAL applicants may not negotiate the terms of an RAL; they must either take or leave RALs under the terms set forth in the RAL application forms presented to them by defendants. The agreements are contracts of adhesion.

141.    Regardless, Block is under a duty to act for the benefit of taxpayers upon matters within the scope of the taxpayer/tax preparer relation.   26 U.S.C. §7216 imposes upon  H&R Block  fiduciary and other duties of candor and fair dealing to plaintiff and the class.

142.    IRS regulations enumerate H&R Block's fiduciary duty as a tax preparer to its clients. Rev. Proc. 94-63 (IR-94-100), §10.02 provides: "[a]ny entity that is involved in the Electronic Filing Program . . . has an obligation to every taxpayer who applies for an RAL to ensure that the taxpayer understands that an RAL is in fact a loan, and not a substitute for a quicker way of receiving an income tax refund."

143.    As stated herein, Block profits in numerous ways from its agency relationship with the RAL lender. In each year since at least 1991, H&R Block has received undisclosed license fees or kickbacks ranging from $3 to $9 from one or more RAL lenders for each RAL H&R Block arranged, or solicited, or otherwise procured. In addition, H&R Block has a 49.99999% ownership interest in the RAL trade.

43

144. Prior to 1997, defendants did not at all disclose Block's 49.9999% interest in the RAL Scheme to its taxpaying customers.

145. In 1997, the RAL application stated "I understand that [Beneficial] may assign or sell its rights relating to my RAL to a third party or an affiliate." This disclosure did not clearly inform the taxpaying customer that its fiduciary, Block, had an ownership interest in the RAL profits. The disclosure is intentionally vague and misleading. Block is neither a third party to the RAL transaction nor a Beneficial affiliate, it is a dual agent.

146. Since 1998, the RAL application has stated "I understand and agree that my ERO may purchase certain RALs after they are made". The disclosure also is intentionally vague and misleading. The ERO is not identified where the disclosure is made. The disclosure does not clearly inform the taxpayer that its fiduciary, Block, has an ownership interest in 49.999999% of the pool RAL profits.

147. Prior to 1997, Block did not anywhere disclose that it received a kickback for every RAL arranged through Beneficial.

148. From 1997-2000, the RAL application either suggested that "your ERO may receive a license fee and/or receive money from the transaction". The ERO was not identified where the disclosure appeared. "May" was intentionally misleading because the ERO- H&R Block- did in fact receive the license fee for every single RAL it arranged. There was no "may" about it.

44

149.    Block also has conceded that it serves as both the taxpayer's agent and the RAL lender's agent in the course of the RAL transaction. *Green,* 735 A.2d at 1054.  Block never disclosed this dual agency to the taxpayer.

150.    Even without Block's concession, it is clear that Beneficial and H&R Block are in an agency relationship regarding the RAL scheme.  By contract and in practice,  H&R Block assists Beneficial in preparing the RAL applications,  assists the client in filling out the application,  transmits electronically to Beneficial the taxpayer data, receives the loan details from Beneficial, cuts the RAL check, imprints Beneficial's signature on RAL checks, and otherwise handles all dealings with the client regarding the RAL procedure.  In addition, H&R Block's's name, together with that of Beneficial, appears on the loan check.

151.    In addition to the foregoing breaches, Block breaches its fiduciary obligations to customers obtaining RALs through H&R Block offices located in Sears, Roebuck & Company ("Sears") retail stores by failing to disclose the kickbacks Block receives from Sears.

152.    When a taxpayer participating in the H&R Block Rapid Refund program picked up his or her RAL proceeds check at a Block location in or near a Sears store, Block's personnel were instructed to steer such taxpayer to Sears to cash their RAL check.

45

153.     When a Block taxpayer client cashed a check at Sears, for which Sears charged a fee, Block received fifteen (15%) percent of that fee from Sears. This kickback was not disclosed to H&R Block taxpayer clients.

154.     Block's receipt of undisclosed fees from Sears as an inducement for the Block defendants to encourage its tax preparation clients receiving RAL checks to cash same at Sears violated the Block defendants' fiduciary duties to their clients. Block was paid by Sears to have H&R Block tax offices steer such RAL recipients to Sears whether or not such means of cashing their RAL checks were in the best interest of clients to whom Block owed fiduciary duties.

155.     The receipt of the fees from Sears by Block also created a conflict of interest. The failure of the Block defendants to disclose such conflict or conflicts constituted a breach of the Block defendants' fiduciary duties.

## VI.  THE TILA VIOLATIONS

156.     At all times relevant hereto, Beneficial National Bank, acting together and conspiring with and aided and abetted by the other defendants, regularly extended or offered to extend credit (within the meaning of 15 U.S.C. § 1602(e)) for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transactions which are the subject of this action was initially payable, making defendants creditors within the meaning of 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

46

157. During the entire class period, defendants violated TILA because,

*inter alia*:

(a) Defendants did not make timely TILA required disclosures.
*See, Affatato*, 1998 WL 472494 at *1. They did not provide TILA disclosures when the
RAL transaction was consummated, *i.e.* when the RAL application was signed. They did
not disclose the APR for the RAL until they provided the "Truth in Lending Disclosures"
on the RAL checks.

(b) Defendants did not accurately disclosure the amounts paid by
Beneficial to Block.

(c) Defendants did not disclose to customers all charges they
would incur by obtaining an RAL.

(d) Block's fees were higher for RAL customers than for non-
RAL customers. Payment of this higher fee for RALs was deferred when the RAL
Application was executed, although that is when the credit transaction was
consummated. Because Block charged RAL customers more than non-RAL customers,
this surcharge also was a finance charge that should have been disclosed under TILA at
consummation.

(e) Defendants understated the APR (Annual Percentage Rate) of
the RAL. The RAL Application controlled the transactions between Beneficial and
consumers and told customers that approximately two weeks afer the customer's tax

47

return is electronically filed, (which occurs on the same day the Agreement is executed) the IRS would send the refund to Beneficial and the RAL is paid off. The Agreement also told customers that they will receive their RAL checks within five days. Thus, the RAL was only outstanding for 9 days (from the date of check receipt to date of payoff) and, consequently, the APR was understated by approximately half.

(f)     Defendants failed to clearly and conspicuously disclose on the RAL check stub that the annual percentage rate of the RAL was an estimate, as required by TILA.

(g)     During the entire class period, part or all of the H&R Block's fees for filing/preparation and withheld by Beneficial were hidden prepaid finance charges that were never disclosed as part of the amount financed. Adding Block's fees doubles or triples the APR "disclosed by Beneficial."

(h)     The kickback from Beneficial to Block for every RAL referred was not disclosed. Defendants internally refer to this payment as a "license fee." In fact, it is a kickback of interest paid by RAL clients (a prepaid finance charge within the meaning of TILA (12 C.F.R. §§ 226.2(a)(23) and 226.4(a)), and/or a direct payment from Beneficial for the procurement and arrangement of high interest loans (essentially a bribe).

(i)     During the entire class period, defendants did not disclose that Block received this kickback, and for TILA purposes, did not disclose that the kickback

48

was a pre-paid finance charge and part of the amount financed. Defendants' TILA disclosures since 2000 confirm that this is true. Adding the license fee substantially increases the real APR.

(j)     The APR is otherwise inaccurately calculated. It is based on an estimated repayment period. If the refund arrives earlier than estimated, the APR increases. No effort is made to remit a portion of any overages to the customer. Nor is the customer informed when the government actually pays the refund, thus leaving the customer ignorant of the actual APR.

## VII.   VIOLATIONS OF THE INTERNAL REVENUE CODE AND REGULATIONS

158.   26 U.S.C. §7216 provides in relevant part:

"(a) any person who's engaged in the business of preparing, or providing services in connection with the preparation of, returns of the tax imposed by Chapter 1, or any person who for compensation prepares any such return for any person, and who knowingly or recklessly -

(1) discloses any information furnished to him for, or in connection with, the preparation of any such return, who

(2)  uses any such information for any purpose other than to prepare, or assist in preparing, any such return, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not more than $1,000 or in prison not more than one year, or both, together with the costs of prosecution."

159.   The RAL application gives the taxpayer statutory assurance that his/her tax data will be treated confidentially and only as provided for therein. In

49

violation of both the RAL application and federal law, defendants use the taxpayer information to market its services in later tax periods

160.    Beneficial's agreements with Block allow Beneficial, or the operating companies of Beneficial Corporation's consumer finance group to use information obtained from the tax returns filed through the RAL program for the solicitation of present and future loans and other financially related products. This is not disclosed to class members.

161.    Defendants use the confidential taxpayer data for engaging in mass mailing of millions of pieces of H&R Block literature touting Block's trustworthy qualities.

162.    Block also violates IRS Pub. 1345 as set forth at ¶8, *supra*.

## VIII.    THE PATTERN OF RACKETEERING ACTIVITY AND COLLECTION OF UNLAWFUL DEBT

163.    Defendants' prohibited activities through the RAL Enterprise violate 18 USC § 1962 (a)(b) and (c) because they are achieved through a pattern of racketeering activity and through collection of unlawful RAL debts.

## A.    Pattern of Racketeering Activity

164.    The RAL Enterprise's pattern of racketeering activity includes at least the following related predicate acts committed continuously and repeatedly over a period in excess of ten years:

50

(a)     Since 1987, the enterprise has engaged in continuous, ongoing acts of mail fraud within the meaning of 18 U.S.C. §1341 in that it has engaged in nationwide, uniform, fraudulent and materially misleading direct mail campaigns, that, in addition to effectuating the RAL scheme, violate IRS Regulation 1345 and 26 U.S.C. § 7216. Defendants repeatedly have used the U.S. Mails in this fashion to solicit and encourage taxpayers to visit Block offices where they may fall prey to the bait and switch scheme alleged herein, and incur substantial unnecessary fees in connection with the processing of their tax refunds.

(b)     Since 1987, the enterprise has engaged in continuous, ongoing acts of mail fraud within the meaning of 18 U.S.C. §1341 in that it has used the U.S. Mails to deliver RAL checks to the taxpayers.

(c)     Since 1987 , the enterprise has engaged in continuous ongoing acts of wire fraud within the meaning of 18 U.S.C. §1343 by using interstate wires to effectuate the fraudulent RAL scheme.

(d)     At all times relevant hereto, the enterprise has engaged in continuous ongoing violations 26 U.S.C. § 7216, by using confidential taxpayer data for purposes beyond what the taxpayer authorizes in the RAL application.

(e)     At all times relevant hereto, the enterprise has engaged in violations of IRS Pub. 1345 which requires that RAL advertising make clear that the taxpayer is borrowing against the anticipated refund and not obtaining the refund itself.

51

(f)     Throughout the class period, defendants engaged in ongoing and continuous violation of TILA, 15 U.S.C. § 1611 by failing repeatedly to provide accurate or timely TILA disclosures.

165.    As set forth more fully herein, the specific predicate acts of mail fraud  include that each year, pursuant to the obligations and agreements set forth expressly in written RAL contracts, defendants use taxpayer data collected in previous years for systematic deceptive mass mailings on H&R Block letterhead promoting Block's trustworthy impartial expertise, Rapid Refunds and RALs without disclosing the fees associated with the RAL, Block's financial interests in the RALs or the true nature of the RAL.  Defendants target millions of their uneducated, financially desperate customers year after year through the use of U.S. mails to effectuate the RAL scheme in this fashion. In each year, the mailings have been created either by H&R Block alone, or in connection with Beneficial and are distributed from the H&R Block offices.

166.    The specific acts of wire fraud include that, each year, and pursuant to the express provisions in the RAL operative contracts, defendants have utilized the interstate wires for each and every RAL they arrange and fund.  Specifically:

(a)     H&R Block offices throughout the country transmit to Beneficial via the interstate wires confidential taxpayer information as collected in the RAL applications such as taxpayer name, social security number, address, authorizations with respect to the loan, representations regarding prior debt and any owed taxes.

52

(b)    After receiving this information from the Block offices for every RAL applicant, Beneficial determines whether to fund the RAL and, if so, Beneficial transmits back to the individual Block office, again via the interstate wires, the particulars for each individual RAL. Specifically, Beneficial uses the interstate wires to transmit for every RAL, the amount of the loan and the fees associates therewith, the TILA disclosures.

167.    Absent these interstate wire transmissions, no RAL would be arranged or funded.

168.    The wire transmissions described herein have taken place for each and every RAL arranged and funded throughout the class period, *i.e.*, for millions of RALs over a twelve year period of time.

169.    Given Block's fiduciary status as described herein and conceded by Block, defendants' failures to disclose Block's numerous financial interests in the RAL program, and its dual agency, the repeated, systematic mail and wire transmissions over a twelve-year period constitutes separate examples of mail and wire fraud. In order words, each RAL arranged and funded without the proper fiduciary disclosures results from a separate wire and mail fraud.

170.    Under 18 U.S.C. § 1341 and 1343, each mailing and interstate wire communication respecting each RAL is a separate act, but all are related to the same

53

deceptive RAL scheme of defendants, ongoing for over a decade and pursuant to the multiple written RAL contracts between them as set forth herein.

171.    Each of these predicate acts had the same or similar purpose (to steer clients to the profitable RAL product), result (clients were so steered, injured financially to the economic benefits of defendants), participants (defendants), victims (the class members), and methods of commission (as set forth above).

172.    Block's repeated entry into and violation of consent decrees with governmental agencies respecting its false and misleading advertising of RALs, *inter alia*, establishes beyond genuine cavil that the racketeering pattern is part of a continuous pattern of intentional deception and fraud over a period of more than ten years . *See, JTH Tax*, 28 Fed. Appx. at 214.

173.    The New York City Department of Consumer Affairs ("NYCDCA") has cited or sued Block at least five times since 1990 for deceptive and misleading trade practices respecting RALs, and violating past agreements and consent orders to discontinue the practice of "failing to distinguish between rapid refund products and refund anticipation loans." To resolve the most recent suit, in December 2002, Block agreed to pay New York City Block customers at least $35.00 each (17,500 of these customers receiving coupons redeemable for cash in the amount of $70.00). Block also agreed to pay additional fines and costs, to the entry of an injunction, and to pay the cost

of an independent monitor to oversee Block's compliance with advertising and training materials.

174.    This recent case asserted virtually identical charges as those asserted in years past against Block.

175.    After its first citation by the NYCDCA in 1990, Block paid a fine and signed an Assurance with the NYCDCA promising that future advertisements mentioning RALs would conspicuously state that a fee or interest is charged for the service and disclose the name of the lending institution.

176.    Despite that Assurance, the next year during tax filing season the NYCDCA cited Block for distributing flyers tending to suggest RALs are rapid refunds by asking the question "Why wait for your tax refund when you can get your money FAST!" Block signed another Assurance promising to post signs on its premises in New York City clearly distinguishing between rapid refunds and RALs. Block again paid a fine.

177.    Despite the previous two Assurances, the NYCDCA again had reason to issue a notice of violation to Block during the 1992 tax season. Specifically, it cited misleading television advertisements that aired from a station in New Jersey but which could be viewed by residents of New York City. It also cited a newspaper ad referring to RALs as refunds. Block signed a third Assurance in 1992 stating that in the future its RAL television advertisements on the television station involved would disclose

55

the name of the lending institution underwriting the offered RAL and would conspicuously state that a fee or interest is charged for a RAL. Again, Block paid a fine in settlement.

178. In 1993, Block was cited for misleading advertisements in its storefronts. The NYCDCA noted that Block had juxtaposed signs advertising "rapid refunds" and "refund anticipation loans" available in "two days" in such a way as to mislead consumers into believing that Block's rapid refund service would result in a two day tax refund. The RAL signs further failed to mention that there was a fee or interest charged for the loan or the name of the lending institution as was required under local law. Block entered into a fourth Assurance promising not to place "rapid refund" and "refund anticipation loans" in such close proximity, promising not to suggest that a RAL is a refund, and (again) promising to state conspicuously on all advertising mentioning a RAL that it is a loan bearing a fee or interest charge and mentioning the name of the lending institution.

179. Since March 1993, at least three other jurisdictions -- Connecticut, Texas and Florida -- have taken action against Block for misleading RAL advertising, entering into consent decrees, permanent injunctions, or receiving assurances about Block's future advertising practices.

180. After investigating Block's practices and discovering for the fifth straight year that Block was violating its own Assurances, the NYCDCA filed charges

against HRB and Eastern in 1995. *Cerullo v. Block, Inc. and Services, Inc.*, Index No. 409497/95 (Sup. Ct. N.Y. Co.) (Friedman, J.S.C.). This time it cited them for the 5,000 placards placed in New York subway cars reading "H&R Block. Rapid Refund. Why wait? Its Your Money" -- a phrase nearly identical to one that Block had been cited for using in 1991.

181.    On April 8, 1996, in *Cerullo*, this court enjoined Block from not clearly distinguishing RALs from its other products during telephone conversations with consumers. Block later settled by agreeing to pay fines and change their telephone solicitation practices.

## B.    Collection of Unlawful RAL Debt

182.    Defendants have also engaged in prohibited activities in violation of 18 U.S.C. §§ 1962(a)(b) and (c) through the collection of unlawful RAL debt.

183.    RAL debt is incurred in violation of federal usury laws, 12 U.S.C. § 85, *et seq.*, and in connection with lending money at a usurious rate, which rate is at least twice that the enforceable rate.

184.    During the entire class period, taxpayers were not informed of the usurious rates associated with their RAL until after the RAL credit transaction was consummated. Thus, there was no agreement by class members to the usurious rate.

57

185.    Class members were injured in their business or property by defendants' collection of the usurious debt in that class members were committed to paying usurious rates without proper disclosure at the time of the RAL consummation.

## IX.   THE RAL ARBITRATION PROVISION

186.    In 1997, defendants inserted an arbitration provision into the standard RAL application form for the express purpose of preventing class members from participating in pending class litigation and reducing the size of classes pending against them.  The provision was in fine print and buried on the second page of the RAL application form.  Block tax preparers did not call the provision to its clients' attention, and did not explain the significance of the provision.

187.    Defendants have waived the right to assert that the arbitration clause is enforceable in this forum because they have maintained for four years that class members who received RALs from 1997 forward were properly part of this certified class.

188.    The RAL arbitration clause is of no force and effect.  It has been declared "patently deceptive" and unenforceable in forums where it appeared in RAL applications after the commencement of the class proceedings.  H&R Block was sanctioned in a New York state proceeding for attempting to enforce the provision retroactively to destroy class members rights.

> "Those who signed the RAL application containing the
> arbitration clause were completely unaware of this litigation

58

and that by signing the RAL form, they were waiving their right to participate in this class action". [For Block to have done that] was "patently deceptive".

        *      *      *

"General support for arbitration does not extinguish putative and actual class members' rights to be informed before being required to waive their right". *Carnegie v. H&R Block, Inc.,* Index No. 606129/96 (N.Y. Supr. Ct., N.Y. Co. 1/12/99 at pgs. 12-13).

189. The provision also was declared retroactively unenforceable in

*Haese v. H&R Block,* No. CV-96-423 (Kleberg Co. Texas) and determined

"an unauthorized, impermissible, knowing and intentional communication with members of the Plaintiff class... designed to subvert the authority of the Court to supervise this class action litigation and contacts with Plaintiff class members; that Defendants' scheme was calculated to sabotage the goals of class action litigation... and constitutes a deliberate attempt to obstruct this Court in the discharge of its duty to protect the absent class and the integrity of the judicial process..."

## X. CLASS ALLEGATIONS

190. Plaintiff brings all claims herein as class claims pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The requirements of sub-parts 23(a), (b)(2) and (b)(3) are met with respect to the class defined below.

191. Since October 26, 1999, defendants have maintained in this court and in other forums that certification of a nationwide class is proper. Defendants, accordingly, are estopped from challenging class certification here.

59

192.    The "class" and "class members" means all persons who did not request exclusion in accordance with the procedures provided by the Preliminary Approval Order entered January 5, 2000 in connection with the rejected settlement (Dkt.123) and who either:

a.    obtained at any time a tax refund anticipation loan ("RAL") (sometimes erroneously referred to as a "Rapid Refund") through an office operating under the trade name of H&R Block (including franchisee or sub-franchisee offices of H&R Block or any H&R Block offices located in Sears stores); or

b.    received a RAL from Beneficial or Household Bank, f.s.b. at any time from January 1, 1987 to October 26, 1999.

Excluded from the Class are:

(I)    All Pennsylvania residents who, while having their tax returns prepared by Block, applied for and received a "Rapid Refund" of their federal tax refund during the years 1990 through 1993 through Block's Rapid Refund Anticipation Loan Program at Block's offices or places of business located in the Commonwealth of Pennsylvania; provided, however, that such customers will be included in the Class with respect to any claims which such customers may have against Household; and

60

(ii)    customers of Jackson Hewitt, Inc. who received a RAL from Beneficial National Bank at any time during the period from December 11, 1992 through December 31, 1995.

193.    Also excluded from the instant class is the certified class in *Peterson v. H&R Block Tax Services*, No 96C6647, pending in the Illinois state court. The *Peterson* class alleges that Block defrauded its customers by inducing them to pay for tax-related services Block knew they could not receive. Specifically, Block committed taxpayers eligible for the Earned Income Tax Credit ("EITC") to RAL fees, even though such individuals were not eligible for RALs.

194.    The class is so numerous that joinder of all members is impracticable. Beneficial and H&R Block issued millions of RALs during the class period. The exact number of class members can be determined by appropriate discovery. Based on the notice sent out in the rejected settlement, the class consists of in excess of 1 million taxpayers.

195.    There are numerous questions of law and fact common to the class, including at least the following:

(a)    Whether defendants failed to provide accurate or complete TILA disclosures at time credit transaction was consummated.

(b)    Whether defendants failed to disclose that H&R Block received a kick back for every RAL it arranged and the amount of that kickback.

61

(c)     Whether defendants failed to disclose H&R Block's ownership interest in RALs.

(d)     Whether defendants failed to disclose that H&R Block was acting as an agent for Beneficial and secretly profiting from that relationship.

(e)     Whether defendants made unauthorized payments in breach of the unilateral RAL contract.

(f)     Whether defendants failed to disclose that defendants would use confidential taxpayer data for unauthorized purposes in violation of 26 U.S.C. § 7216 and in breach of the unilateral RAL contract.

(g)     Whether defendants' ongoing intentional deception and fraud to effectuate the RAL scheme through the use of interstate wires, and the U.S. Mails constitutes a "pattern of racketeering activity" as that term is defined in §1961(5) of RICO, 18 U.S.C. §1961(5).

(h)     Whether defendants have collected unlawful debts as defined in §1961(6) of RICO, 18 U.S.C. §1961(6).

(i)     Whether defendants have used the income derived from a pattern of racketeering activity or through collection of unlawful debt to invest in the acquisition of any interest in or in the establishment or operation of an enterprise (here, the RAL enterprise) that is engaged in, or the activities of which, affect interstate commerce in violation of 18. U.S.C. §1962(a).

62

(j)     Whether defendants have used the income derived from a

pattern of racketeering activity or through collection of unlawful debt to acquire or

maintain any interest in or control of any enterprise that is engaged in or the activities of

which affect interstate commerce in violation of 18. U.S.C. § 1962(b).

(k)     Whether defendants, employed or associated with the RAL

enterprise, which is engaged in or whose activities affect interstate commerce,  have

conducted or participated in the conduct of the RAL enterprises affairs through a pattern

of racketeering activity or through collection of unlawful debts in violation of 18. U.S.C.

§1962(c).

(l)     Whether defendants have conspired to violate 18. U.S.C. §§

1962(a), (b) or (c).

(m)     Whether defendants' conduct of the RAL scheme proximately

damaged plaintiff and members of the class.

196.    The prerequisites to maintaining a class action for injunctive relief

against defendants, who continue to engage in the practices complained of herein exist.

197.    If injunctive relief is not granted, great harm and irreparable injury to

plaintiff, members of the class, and the consuming public will continue in that defendants

will continue to use confidential tax payer data for unauthorized purposes in violation of

26 U.S.C. § 7216, defendants will continue to victimize taxpayers with their bait and

switch scheme, effected through use of the U.S. Mails and interstate wires, defendants

will continue to violate I.R.S. Regulation 1345 which requires clear disclosure that the RAL is a loan, and charging consumers usurious interest on RALs, engaging in the pernicious bait. Defendants have repeatedly entered into and violated consent decrees with governmental bodies and courts respecting these practices. This repeated malfeasance makes plain the need for an enforceable judgment providing injunctive relief.

198. Plaintiff's claims are typical of the claims of all members of the class and plaintiff has the same interests as the other members of the class. All claims are based on the same remedial and legal theories.

199. Plaintiff will fairly and adequately represent the interests of the class. Plaintiff is committed to vigorous prosecution of this case and has retained counsel who are experienced and competent in the prosecution of class actions, civil RICO and complex litigation. Neither plaintiff nor counsel has interests adverse to the class.

200. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because (a) the size of the individual claims does not justify the cost of litigation in most cases, (b) most victims were and still may be unaware of their legal rights against defendants, and (c) most of the victims are unsophisticated persons.

201. Plaintiff expects no difficulty in the management of this class action. The evidence that will enable her to prove the allegations of this Second Amended

64

Complaint is ascertainable through discovery. The identities of class members are known to defendants, a point they conceded in attempting to have the rejected settlement herein approved, and damages can be readily determined from defendants' records.

## XI. CAUSES OF ACTION

### COUNT I

### AGAINST THE BENEFICIAL/HOUSEHOLD DEFENDANTS AND THE BLOCK DEFENDANTS: VIOLATION OF TILA, 15 U.S.C. § 1605, *et seq.*

202. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

203. The RALs described herein are "closed-end credit" transactions pursuant to 12 C.F.R. §226.2(a)(10). Thus, pursuant to §§226.17(b) and 226.18, Beneficial and Block are required to make certain disclosures regarding the finance charge, APR and amount financed *prior* to consummation of each RAL transaction.

204. During the entire class period, defendants failed to make timely disclosures at the point the class member were bound to the RAL credit transaction. *See* 12 CFR §226-17(b); *Affatato*, 1998 WL 472494 at *2-3.

205. Defendants did not disclose the "license fee" paid to Block for every RAL, or that such was a pre-paid finance charge, within the meaning of 12 C.F.R. §§226.2(a)(23) and 226.4(a), and part of the amount financed.

206.    License fees are a pre-paid finance charge because they are imposed by Beneficial and payable indirectly (and unknowingly) by RAL clients as an incident to or a condition of the credit extension and such fees are withheld from the proceeds of the RAL credit.

207.    Since 2000, defendants have disclosed that the license fees paid to Block are a pre-paid finance charge and part of the amount financed and have provided taxpayers this disclosure at the time the RAL credit transaction is consummated, *i.e.* when the RAL application is signed.

208.    Block's fees for filing/preparation have been higher for RALs than Block otherwise charges in comparable transactions not involving RALs. In this case, such extra amount is a prepaid finance charge within the meaning of 12 C.F.R. §§226.2(a)(23) and 226.4(a) as a charge withheld from the credit, payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor (Beneficial) as an incident to or a condition of the extension of credit. Furthermore, such fee or portion thereof was imposed on the consumer by someone (Block) other than the creditor (Beneficial). The creditor (Beneficial) requires the use of a third party (Block) as a condition of or incident to the extension of credit.

209.    For each year of the class period, defendants did not calculate the finance charge listed on the loan checks correctly in several respects, as set forth at VI, *supra*.

66

210.    Beneficial estimated the APR amount disclosed on RAL checks based on a 14 day loan period.  However, Beneficial did not describe the APR listed on the front of the check as "estimated," pursuant 12 C.F.R. §226.17(c)(2).  Nor did Beneficial otherwise adequately disclose that the APR listed on the RAL checks is estimated only.

211.    The disclosure statement issued in conjunction with the consumer credit transactions complained of herein thus violated the requirements of TILA and Regulation Z in the following and other respects:

(a)    By failing to provide the required disclosures prior to consummation of the transaction in violation of 15 U.S.C.  §1638(b)(1) and 12 C.F.R. §226.17(b).

(b)    By failing to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. §1632(a) and 12 C.F.R. §226.17(a).

(c)    By failing to include in the finance charge certain charges imposed by Beneficial, or imposed by the tax preparers and required by Beneficial, and payable by plaintiff and the class  incident to the extension of credit as required by 15 U.S.C. § 1605 and 12 C.F.R. §226.4, thus improperly disclosing the finance charge in violation of 15 U.S.C. §1638(a)(3) and 12 C.F.R. §226.18(d).

(d)    By disclosing an APR based upon improperly calculated and disclosed finance charges and amounts financed, Beneficial uniformly understated the

67

disclosed APR in violation of 15 U.S.C. §1638(a)(4) and 12 C.F.R. §§226.18(e) and 226.22(2) or (3).

(e)     By failing to clearly label the APR as an "estimate," Beneficial violated 15 U.S.C. §1631(c) and 12 C.F.R. §226.17(c)(2).

212.    Block is primarily liable and/or aided, abetted and conspired in these violations with Beneficial by, *inter alia*, preparing and filing the returns, obtaining information necessary for the completion of the RAL application and loan certification process, completing IRS Form No. 8453, providing customers with signed copies of the signed applications, handling RAL applications, taking care and custody of, printing and distributing RAL checks.  In addition, Block purchases an undivided ownership interest in the loans from Beneficial.

213.    Defendants' concealment of these nondisclosures, including the license fees and/or kickbacks, served equitably to toll the one year TILA statute of limitations.

214.    As a result of its conduct described herein, the parties, aiding, abetting, and conspiring with one another, are liable to the plaintiff and the class pursuant to 15 U.S.C. §1640(a) for their actual damages to be determined, statutory damages of $500,000, and the costs and attorneys fees incurred in bringing this action.

## COUNT II

## AGAINST ALL DEFENDANTS:
### VIOLATION OF 18 U.S.C. §§ 1961, 1962(a)-(d), *et seq.*

215.    Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

216.    At all relevant times, defendants are and have been "persons" as that term is defined in 18 U.S.C. §1961(3) of RICO.

217.    At all relevant times, in violation of 1962(a) of RICO, defendants intentionally and purposefully have used or invested income received from the pattern of racketeering activity described herein, and through collection of unlawful RAL debts. Defendants have used this income to acquire an interest in, establish or operate the RAL enterprise herein described, which is engaged in activities affecting interstate commerce to effectuate the RAL scheme and which has caused injury to plaintiff and the class members' business or property by causing them to pay unnecessary, undisclosed and usurious fees in connection with their tax refunds. Defendants repeatedly have done this in contravention of consent decrees designed to halt such misconduct between themselves and governmental bodies and courts. This activity will continue indefinitely unless and until halted by judicial intervention.

218.    At all relevant times, in violation of 1962(b) of RICO, defendants have, through the pattern of racketeering activity described herein, or through collection of unlawful RAL debts, acquired and maintained an interest in or control of the RAL

69

enterprise, which is engaged in activities affecting interstate commerce resulting in injury to plaintiff and the class by reasons of defendants acquisition or maintenance of such interest.

219.   At all relevant times, in violation of 1962(c) of RICO, defendants, either associated with or employed by the RAL enterprise, which is engaged in activities affecting interstate commerce,  have intentionally conducted or participated in the conduct of the affairs of the RAL enterprise , though a pattern of racketeering activity or collection of unlawful debt, resulting in injury to plaintiff and the class.

220.   In violation of 1964(d) of RICO, defendants have conspired to violate subsections 1961(a), (b) and (c) by conducting the affairs of the association-in-fact RAL enterprise though the RAL Agreements executed repeatedly since 1987, the express and intentional objectives of which are to conduct the RAL enterprise and effectuate the RAL scheme through a pattern of racketeering activity or collection of unlawful debt causing injury to plaintiff and the class.

## COUNT III

### AGAINST ALL DEFENDANTS:
### VIOLATION OF THE ICFA AND SIMILAR UDAP
### STATUTES OF OTHER STATES

221.   Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

70

222.    At all relevant times, Section 2 of the Illinois Consumer Fraud and

Deceptive Business Practices Act, 815 ILCD 505/2 (formerly, Ill.Rev.Stat. Ch. 121,

Section 262), has provided:

> [U]nfair or deceptive acts or practices, including
> but not limited to the use or employment of any
> deception, fraud, false pretense, false promise,
> misrepresentation or the concealment,
> suppression or omission of such material fact . .
> . in the conduct of any trade or commerce are
> hereby declared unlawful.

223.    At all relevant times, similar statutes prohibiting unfair and deceptive

acts and practices in consumer transactions were in effect in each state where defendants

have an office and in each state where defendants do business.

224.    Regardless, applicable choice of law rules and analyses required by

*Phillips Petroleum v. Shutts*, 472 U.S. 797, 821 (1985), and *In the Matter of*

*Bridgestone/Firestone*, 288 F.3d 1012, 1015 (7th Cir. 2002), require that Illinois law apply

to this claim.

225.    Should the court determine that Missouri law applies given that

Block is headquartered there, there is no conflict in the applicable standards or elements

between Missouri's Consumer Protection Statute (407.020) and the ICFA.

226.    Defendants engaged in unfair and deceptive trade practices described

herein in violation of the ICFA and similar UDAP statutes of other states, including

Missouri. Specifically, defendants intentionally concealed, suppressed and omitted the

71

material facts set forth at ¶¶ 101-120 in the course of their trade or business and such

deceptive omissions proximately caused actual damage to class members who incurred

undisclosed unnecessary fees associated with their tax refunds.

227.    Defendants' violation of TILA, 15 U.S.C. 1604 *et seq*., as alleged

herein and set forth in Count I, serves as predicate to this ICFA and UDAP claim.

228.    The timing and content of Defendants' RAL TILA disclosures since

2000, confirms plaintiff's allegations respecting defendants' TILA violation for the class

period.

## COUNT IV

## AGAINST BLOCK:
## BREACH OF FIDUCIARY DUTY

229.    Plaintiff repeats and realleges each of the allegations contained in the

foregoing paragraphs as if fully set forth herein.

230.    As set forth herein , in each year of the class period, Block breached

its agency and fiduciary duties to the class.

231.    These failures violated agency and fiduciary laws in each of the fifty

(50) states and violated expressly the Restatement of Agency (2d) §388, which provides

that "[u]nless otherwise agreed, an agent who makes a profit in connection with

transaction is under a duty to give such profit to the principal."

232.    As a result of the agency and fiduciary breach, plaintiff and the class

are entitled to recover all fees earned by Block as a result of that relationship, including

72

but not limited to preparation and filing fees, license fees, share of pooling and any other monies derived thereby. Block must render an accounting to the class and disgorge the wrongful profits, together with interest, costs and attorneys' fees.

## COUNT V

### AGAINST BENEFICIAL:
### SUBORNATION OF BREACH OF BLOCK'S FIDUCIARY DUTIES

233.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

234.    Plaintiff and the other members of the class on the one hand and defendants, on the other, are in positions of great disparity or inequality relative to each other. Beneficial, together with and through Block, encourage plaintiff and the other members of the class to rely on Beneficial and Block's superior knowledge, help and guidance in filing tax returns and obtaining tax refunds.

235.    Unbeknownst to the taxpayers, Beneficial pays license fees/kickbacks to Block, which are intended to and do suborn Block from its fiduciary duties, including the duty of loyalty, to consumers/taxpayers.

236.    As a consequence, plaintiff and class members are steered toward RALs, pay exorbitant interest rates and are damaged thereby. Beneficial has unjustly enriched themselves and must disgorge revenues and income created by their unlawful and inequitable conduct.

73

## COUNT VI

### AGAINST ALL DEFENDANTS:
### DEFENDANTS VIOLATED THE RAL AGREEMENT, A UNILATERAL
### CONTRACT, BY MAKING UNAUTHORIZED PAYMENTS

237.    Plaintiff repeats and realleges each of the allegations contained in the

foregoing paragraphs as if fully set forth herein.

238.    In each year, the RAL Agreement signed by the class members

expressly stated that only authorized payments to Block were permitted.  Among the

authorized payments was a finance charge to Beneficial.  There was no authorization that

Beneficial could pay Block a portion of this finance charge as a secret license fee.  Thus,

defendants breached their express contractual agreement with the class because  because

Block received a secret license fee for every RAL it referred and this secret payment was

part of the amount financed and a pre-paid finance charge.

## COUNT VII

### AGAINST ALL DEFENDANTS:
### DEFENDANTS VIOLATE THE RAL AGREEMENT, A UNILATERAL
### CONTRACT, BY USING CONFIDENTIAL TAXPAYER INFORMATION FOR
### UNAUTHORIZED PURPOSES

239.    Plaintiff repeats and realleges each of the allegations contained in the

foregoing paragraphs as if fully set forth herein.

240.    In each year 1987 to the present, the Refund Anticipation Loan

Agreement ("RAL Agreement") has provided that Block "may not use or disclose tax

return information or such other information for any purpose not otherwise authorized by

26 U.S.C. 7216 other than as stated herein," and "Beneficial may use such information to conduct testing of the RAL program to update such system and keep it operational. I authorize [Beneficial] to provide [Block] with information about my current account balance."

241. Notwithstanding this limited authorization, defendants routinely use taxpayer data to market the RAL program though the U.S. mails and other improper communications.

242. This conduct constitutes a breach of the express language set forth in the unilateral contract formed by plaintiff's execution of the RAL application.

COUNT VIII

AGAINST ALL DEFENDANTS:<br>UNJUST ENRICHMENT

243. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

244. By virtue of the foregoing conduct, and to the extent the court determines there was no express contract here between defendants and the class members, defendants have been unjustly enriched. Beneficial received undisclosed finance charges including surcharges and administrative fees. Block received unauthorized kickbacks, and other fees, electronic filing fees, and tax preparation fees. Both defendants received interest income by virtue of the RALs as well as fee income.

75

245. These benefits were incurred by defendants at plaintiff and the class members' expense and to their detriment.

246. Whether Illinois or Missouri law apply, defendants' retention of these benefits violates the fundamental principles of justice, equity, and good conscience and a constructive trust should be imposed thereon so that defendants can make restitution to the class.

## XII. TOLLING OF STATUTES OF LIMITATIONS

247. The applicable statute of limitations have been tolled by the following class actions: *Beckett et al. v. H&R Block et al.*, No. 94 C 0776 (N.D. Ill. 1994); *Rizzo et al. v. H&R Block Inc., Mellon Bank, et al.*, No. 95-1001-CV-W-4 (W.D. Mo.); *Affatato v. Beneficial National Bank, et al.*, CV965376 (E.D.N.Y.); *Zawikowski v. Beneficial National Bank*, 98 CV 7178 (N.D.Ill.); *Turner v. Beneficial National Bank*, 98 CV 2550 (N.D.Ill.); *Green v. H&R Block, Inc.*, No. 971950231/CC 411 (Cir.Ct. Baltimore City, MD); *Basile v. H&R Block, Inc.*, Civil Action No. 93-2583 (First Judicial District of Pennsylvania); *Carnegie v. H&R Block, Inc.*, CV96/606129 (N.Y.Sup.Ct. N.Y. Co.); *Haese v. H&R Block, Inc.*, CV96-423 (Dist.Ct of Kleberg Co. TX).

248. Applicable statutes of limitations also are tolled by principles of fraudulent concealment. Defendants' wrongful practices have been fraudulently concealed as set forth in the complaint and by the practices of the association-in-fact RICO enterprise with which they are associated. These practices include, but are not

76

limited to: failures to disclosure that H&R Block receives a kickback for every RAL it arranges; that H&R Block owns nearly 50% of the RAL business; and failures to provide timely and accurate TILA disclosures. *See, Affatato, supra.* Defendants' failure to disclose such facts resulted in the inability of plaintiff and all class members to learn of the RAL scheme. Plaintiff and the class members were unaware of these facts and were unable to learn or defendants' RAL scheme through reasonable diligence. As a result, any applicable statute of limitations applicable to the claims asserted in this Second Amended Complaint have been equitably tolled with respect to plaintiff and class members.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following judgment:

1.  A declaration that defendants violated TILA;

2.  A declaration that defendants violated TILA;

3.  A declaration that Block breached its fiduciary duties to the class, and that Beneficial suborned Block's breach of its fiduciary duties;

4.  A declaration that defendants have engaged in a pattern of racketeering activity and collection of unlawful debts;

5.  A declaration that defendants have engaged in deceptive trade practices;

77

6.     A declaration that defendants have breached the unilateral RAL contract through the unauthorized use of confidential taxpayer data and by making unauthorized payments;

7.     A declaration that defendants have unjustly enriched themselves;

8.     An order requiring defendants to disgorge any revenues collected by them through the RAL scheme, and imposing a constructive trust thereon;

9.     A judgment in favor of plaintiff and the class and against defendants for all damages including amounts to be proved at trial, together with actual damages and statutory damages of $500,000 as allowed by 15 U.S.C. § 1640(a)(2)(B), and for such additional damages as are proven for each breach of contract;

10.    A judgment in favor of plaintiff and the class against the Block defendants for disgorgement of all monies received by them (including but not limited to preparation, document filing, license fees and pooling) as a result of the breach of fiduciary duty and/or breach of the agency relationship.

11.    A judgment in favor of plaintiff and the class against the Beneficial defendants for disgorgement of all monies received by them as a result of their subordination of Block's fiduciary duties.

78

12.     A mandatory injunction requiring defendants to discontinue their deceptive and unfair trade practices, pattern of racketeering activity and collection of unlawful debt; and unauthorized use of confidential taxpayer data.

13.     A judgment in favor of plaintiff and all class members and against defendants for all damages including amounts to be proved at trial, together with triple damages as allowed by RICO, the ICFA and similar state statutes, and for such additional damages as are proven for breach of contract;

14.     An accounting to determine the amounts defendants have illegally and unjustly profited at the class members' expense, and disgorgement to the class of such funds.

15.     An award to plaintiff of the expenses of this suit, including costs, reasonable attorneys' and experts' fees, pursuant to each of 18 U.S.C. § 1961, 15 U.S.C. § 1640(a)(3), the ICFA and similar state statutes, and the common fund doctrine;

16.     Such other favorable relief as this Court may deem just equitable or proper.

**Plaintiff requests trial by jury.**

Dated:     June 4, 2003
           Chicago, Illinois

                                Respectfully submitted,

                                By: _____
                                One of Plaintiff's Attorneys

79

KIRBY McINERNEY & SQUIRE, LLP
Roger W. Kirby, Esq.
Peter S. Linden, Esq.
Joanne M. Cicala, Esq.
830 Third Avenue, 10th Floor
New York, New York 10022
(212) 317-2300

LEVY, ANGSTREICH, FINNEY,
BALDANTE, RUTENSTEIN & COREN, P.C.
Steven E. Angstreich, Esq.
Michael Coren, Esq.
Carolyn C. Lindheim, Esq.
1616 Walnut Street, 18th Floor
Philadelphia, Pennsylvania 19103
(215) 735-1616

**Co-Lead Counsel**

FUTTERMAN & HOWARD, CHTD.
Ronald L. Futterman, Esq.
Michael I. Behn, Esq.
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
(312) 427-3600

MUCH SHELIST FREED DENENBERG AMENT &
RUBENSTEIN, P.C.
Michael B. Hyman, Esq.
191 North Wacker Drive, Suite 1800
Chicago, Illinois 60606-1615
(312) 521-2000

G:\PC\ZAWIKOW\6604amendedcomplaint.final.jmc.wpd

EXHIBIT

A

48280838

## TRUTH-IN-LENDING DISCLOSURES
### ITEMIZATION OF AMOUNT FINANCED

Beneficial
National Bank

1. AMOUNT PAID DIRECTLY TO YOU ......... ***$390.00

2. AMOUNT PAID TO H & R Block ......... ****$76.00

3. AMOUNT PAID TO BNB ......... ***$466.00

4. AMOUNT FINANCED (ITEMS 1 + 2 + 3) ......... ****$34.00

5. TOTAL PREPAID FINANCE CHARGE (Itemized Below): 

   AMOUNT PAID TO BNB ......... *****$34.00

1. Amount Financed (the amount of credit provided to you or on your behalf) ......... ***$466.00

2. FINANCE CHARGE (the dollar amount the credit will cost you) ......... ***$34.00

3. Total of payments (the amount you will have paid after you have made all scheduled payments) ......... ***$500.00

4. ANNUAL PERCENTAGE RATE (the cost of your credit as a yearly rate) ......... 204.852%

00-132083-00134-5

1-800-443-3240 NON NEGOTIABLE

SSN 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

DATE '02/03/95

6. TOTAL FINL (Items 4 + 5). If line 5 left blank, amount is "0". ......... **$500.00

PLEASE REMOVE THIS STUB AND RETAIN FOR YOUR RECORDS BEFORE DEPOSITING CHECK

SEE REVERSE SIDE FOR CERTIFICATION OF INDEBTEDNESS

## CERTIFICATE OF SERVICE

       The undersigned attorney hereby certifies that on June 4, 2003 he caused a copy of the foregoing SECOND AMENDED CLASS ACTION COMPLAINT to be served by first-class mail upon the following counsel as follows:

Francine Schwartz
Francine Schwartz, P.C.
2103 East Lillian
Arlington Heights, Illinois 60004
Telecopier No.: (847) 255-0598

Loren Stone
Loren R. Stone and Associates
8707 North Skokie Boulevard
Suite 230
Skokie, Illinois 60077
Telecopier No.: (847) 679-6695

Robert Adams
Law Offices of Robert Adams
105 W. Madison Street
Chicago, Illinois 60606
Telecopier No.: (312) 346-6228

Daniel M. Harris
Law Offices of Daniel M. Harris
150 North Wacker Drive
Suite 3025
Chicago, Illinois 60606
Telecopier No.: (312) 960-1936

David Latham
Law Offices of David Latham
150 North Wacker Drive
Suite 1400
Chicago, Illinois 60606
Telecopier No.: (312) 782-1917

Howard B. Prossnitz
Law Offices of Howard B. Prossnitz
200 West Madison Street
Suite 2040
Chicago, Illinois 60606
Telecopier No.: (312) 960-1804

James D. Adducci
Marshall L. Blankenship
Adducci, Dorf, Lehner, Mitchell & Blankenship, P.C.
150 N Michigan Ave, Suite 2130
Chicago, Illinois 60601
Telecopier No.: (312) 781-2811

Alan S. Kaplinsky
Burt M. Rublin
Edward D. Rogers
Ballard, Spahr, Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Telecopier No.: (215) 864-8999

Louise Ellingsworth
Bryan Cave LLP
3500 One Kansas City Place
1200 Main Street
Kansas City, MO 64105-2100
Telecopier No.: 816-374-3300

Michael Hyman
Much Shelist Freed Denenberg Ament & Rubenstein, PC
191 N. Wacker Dr.
Suite 1800
Chicago, IL 60606-1615
Telecopier No.: 312-521-2100

Scott R. Lassar
David F. Graham
Theodore R. Scarborough
Sidley Austin Brown & Wood
Bank One Plaza
10 S. Dearborn St.
Chicago, IL 60603
Telecopier No. 312-853-7036

John Pentz
The Objectors Group
43 Kendall Rd.
Sudbury, MA 01776-2925
Telecopier No. 707-276-2925

Robert P. Cummins
Cummins & Cronin LLC
77 W. Wacker Dr.
Suite 4800
Chicago, IL 60601
Telecopier No.: 312-578-1234

Anton R. Valukas
Matthew M. Neumeier
Jenner & Block
One IBM Plaza
330 N. Wabash
45th Floor
Chicago, IL 60611-7603
Telecopier No.: 312-840-7303

Michael S. Hilicki
Beeler Schad & Diamond, PC
332 S. Michigan Ave.
Suite 1000
Chicago, IL 60604
Telecopier No.: 312-939-4661

Steven A. Martino
W. Lloyd Copeland
Taylor Martino & Hedge, P.C.
61 St. Joseph Street, Suite 1600
Mobile, Alabama 36602
Telecopier No.: 251-433-4207

G:\PC\ZAWIKOW\COUNSEL SERVICE\COS Counsel of Record 6-4.wpd
(revised 5/12/03)